THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
NATHANIEL KNOX, Defendant-Appellant.

First District (5th Division)   No. 1—86—2543

Opinion filed July 28, 1989.

Randolph N. Stone, Public Defender, of Chicago (Bruce C. Landrum,
Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and Linda
Woloshin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

On the evening of October 31, 1985, Nathaniel Knox, then 15 years old, was arrested at his home for the sexual assault of his six-year-old female neighbor, T.B. He was taken to the Area 4 police station at Harrison Street and Kedzie Avenue, where he signed a written confession. Prior to his jury trial, defendant moved, unsuccessfully, to suppress that statement on the basis that the confession was not voluntarily given. The statement was admitted into evidence at trial and defendant was subsequently convicted of aggravated kidnapping and aggravated criminal sexual assault. Ill. Rev. Stat. 1985, ch. 38, pars. 10—1, 12—14.

We now reverse defendant's convictions and remand the cause for retrial because we conclude defendant's pretrial motion to suppress his confession was improperly denied, and summarize below relevant testimony adduced during the hearing on defendant's motion to suppress.

Chicago police detective Thomas Skol testified that on October 31, 1985, he was assigned to defendant's case and spoke to T.B. and her mother at Columbus Hospital. Based on that conversation, Skol went to 4341 West Kinzie Street, where defendant lived with his parents. It was approximately 9:15 p.m. when Skol arrived. Skol was with police sergeant John Schillen. Skol stated he was admitted into the residence and there arrested defendant.

Skol stated he spoke with defendant's father and indicated to him that he could accompany defendant to the police station. However, defendant's father "chose not to" go. Skol testified he either left a card with defendant's father, presumably containing information where defendant was being taken, or wrote on a piece of paper his name and telephone number. Skol then took defendant to the Area 4 police station.

There, Skol stated, he advised defendant of his rights pursuant to *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, and defendant replied that he understood what those rights were. Skol then advised defendant of the allegations that had been made against him. Skol further testified that he asked defendant if he wanted to account for his actions, whereupon defendant admitted the sexual encounter with T.B.

Skol stated that he contacted Assistant State's Attorney Gregory Girote by telephone, Girote arrived at the police station at approximately 12 p.m. and was advised of information developed in the case. They then proceeded to Columbus Hospital where they spoke with T. B. and her mother. They returned to the police station and Girote

again advised defendant of his rights pursuant to *Miranda.* Defendant recounted in the interview with Girote a similar version of the sexual encounter that defendant had earlier related to Skol. Skol testified that defendant's statement was reduced to writing, and that after defendant read the statement, he signed it.

On cross-examination, Skol testified that there were several other people in the house when defendant was arrested, but he did not recall whether there were any young children, nor could he recall defendant's father's reason for not accompanying defendant to the police station. He admitted the initial interview with defendant began at approximately 9:45 p.m. and lasted approximately 45 minutes, and that the second interview by Girote began at approximately 1:45 a.m. and lasted for approximately 15 to 20 minutes. Skol acknowledged defendant was at the police station from 9:30 p.m. to 2 to 2:15 a.m.

Skol could not recall whether, during his initial interview of defendant, defendant had asked if his mother was coming to the police station, or if she was present in the station, or if defendant had said that he wanted to speak to his mother. When asked whether he was aware that defendant's mother was in the police station, he admitted she may have been there, but stated he did not remember seeing her, and further stated that he was certain that he did not inquire at the front desk whether or not anybody came to see about defendant.

He admitted that he knew at the time of the arrest that defendant was 15 years old, and that, although he notified the "Youth Division" sometime between 9:45 and 10 p.m. after defendant's arrest, no juvenile officer was present at any time during the interview.

On redirect examination, Skol stated that by 11:30 p.m. defendant had already recounted his sexual encounter with T.B. The written confession was signed at 2:21 a.m., after the second interview with Girote.

Assistant State's Attorney Gregory Girote testified that after receiving Skol's telephone call he arrived at the Area 4 police station at approximately 11:50 p.m. on November 1, 1985. After he and Skol had spoken with T.B. and her mother at Columbus Hospital, they returned to the police station where he, Girote, proceeded to interview defendant.

He testified that he introduced himself and explained to defendant his rights pursuant to *Miranda* and defendant indicated he understood each of the rights read to him.

After questioning defendant, Girote reduced the conversation to writing and went over it with defendant, who sat next to him. As

Girote read from the statement, Girote ran his finger underneath the writing. Defendant made corrections in two places and initialed the corrections.

On cross-examination, Girote explained that after he reduced defendant's statement to writing, defendant read it twice: once to himself and again when Girote read it out loud. Girote further stated defendant never asked him if his mother was at the police station or requested to have her present.

Lula Key, defendant's mother, also testified. She testified that defendant was her eldest son. She stated that she had five other children, the youngest of which was six years old, and that on the evening of October 31, 1985, she had been out at a restaurant with one of them. Her husband had the responsibility of watching the other children in her absence. When she arrived home at approximately 9:40 p.m., she learned of defendant's arrest.

Key stated her husband took her to the Area 4 police station at about 10 p.m., "because it seemed like the news was on when [we] left." The trip took approximately 5 to 10 minutes.

She identified herself at the police station and inquired about her son with a detective at the front desk. The detective told her defendant was in a room in the station and that she should wait. She waited for what seemed like "an hour or so" before another detective spoke with her. That detective told her there was nothing she could do and that she might as well go home because her son had made a confession and that the State's Attorney would have to be called in. Although she could not identify the detective who told her to go home, she stated the detective had indicated to her that he had personally spoken with her son. The time was approximately 12 p.m.

On cross-examination, Key clarified that, when she inquired of her son at the front desk of the police station, she was directed to the detective division, where she spoke to the detective who had told her to wait. Key responded affirmatively to counsel's question that it was Detective Skol, who had earlier testified in the hearing on the motion to suppress, who came to tell her that she should go home because defendant had made a confession.

Key stated that at the time of his arrest, defendant was 25 days short of his sixteenth birthday, was a sophomore at John Marshall High School, and knew how to read and write.

Defendant testified that, at the police station, he was taken to a small, windowless room having one door. Defendant stated that, there, Detective Skol questioned defendant and told him that "the [j]udge wasn't going to believe [defendant's] denying [his involve-

ment]'' and that defendant "might as well admit to it." Defendant stated the first questioning by Skol lasted 10 to 15 minutes.

Defendant denied that Skol had read to him his *Miranda* rights and indicated he did not understand what those rights were.

Defendant testified that as Skol was leaving the interview room after he questioned defendant, he asked Skol whether his mother had as yet arrived in the police station. Skol said he would check, but he did not come back to tell defendant whether or not his mother was present.

Defendant stated he remained in the interview room sleeping during the time period between when Skol left after first questioning defendant. Skol returned with Girote several hours later. He was awakened from sleep when they entered the interview room. Defendant stated Girote handed him a prepared statement with the second page folded over the first page and was told to sign it. He signed the statement without reading it. Defendant recalled that Girote had read the statement to him after defendant had signed it. Although he admitted initialing the statement, he stated that, rather than as a result of indicating corrections in the statement, he did so at Girote's direction.

On cross-examination, defendant acknowledged that, at the time of his arrest, the police officers told his father where defendant was being taken and had indicated defendant's father could accompany him. Defendant also acknowledged his signature appeared on the statement underneath a recitation of his rights.

OPINION

■■ ■ With respect to voluntariness, confessions made by juveniles are generally subjected to the same scrutiny as confessions of adult defendants. (*People v. Prude* (1977), 66 Ill. 2d 470, 363 N.E.2d 371.) The test is whether, under the totality of the circumstances, the statement was made freely, without compulsion or inducement of any sort, with consideration given to the characteristics of the accused as well as the details of the interrogation. (*People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606.) Nevertheless, our supreme court has also recognized that the receiving of an incriminating statement by a juvenile is a sensitive concern requiring great care, in absence of counsel, to assure the juvenile's confession was neither coerced or suggested, nor a product of fright or despair. *Prude*, 66 Ill. 2d at 476, 363 N.E.2d at 373, quoting from *People v. Simmons* (1975), 60 Ill. 2d 173, 179-80, 326 N.E.2d 383, 386, quoting from *In re Gault* (1967), 387 U.S. 1, 55, 18 L. Ed. 2d 527, 561, 87 S. Ct. 1428, 1458.

■ Based on aspects of police conduct surrounding defendant's initial interview in the instant case, we are not satisfied that the requisite care was exercised to assure defendant's statement was not free of compulsion. We are most concerned that defendant's statement was made before defendant had an opportunity to confer, prior to questioning, with an adult interested in his welfare, either his parents or a juvenile officer.

The record establishes defendant was arrested at his home on the evening of October 31, 1985, and was immediately taken to the Area 4 police station for questioning. It is undisputed that defendant's father, who was home at the time of defendant's arrest, was apprised of the situation and was advised where defendant was being taken. It is also undisputed that, although invited, he did not accompany defendant to the Area 4 police station. However, it is sufficiently clear from Lula Key's testimony that the opportunity to accompany defendant to the police station was an empty one. Key testified that she, accompanied by one of her children, was not at home when the police came and arrested defendant. Her other children, all younger than defendant, were home under the supervision of her husband. Obviously, defendant's father was not free to accompany defendant and leave the other children alone.

More importantly, the record reveals the police contributed significantly to eliminating any opportunity defendant had from speaking to his mother at the police station. While the exact time of the sequence of events cannot be determined conclusively from the record, there is a strong indication that defendant's mother was in the Area 4 police station when defendant was initially questioned by Skol, but was precluded from seeing him.

The record establishes Skol arrived at 4341 West Kedzie Street at approximately 9:15 p.m., arrested defendant shortly thereafter, and brought defendant to the police station. Defendant was in the station at approximately 9:30 p.m. Before being taken to the interview room, Skol recorded defendant's biographical information. Defendant's interview began at approximately 9:45 p.m. and lasted approximately 45 minutes.

By approximately 9:40 p.m., defendant's mother had arrived home, had learned of the arrest, and had left for the police station. Key stated it was approximately 10 p.m. when she left. The trip lasted 5 to 10 minutes.

At the police station, Key identified herself, was directed to the detective division, and was there told to wait. She waited there for approximately an hour before a detective, which she acknowledged

was Skol, told her her presence was inconsequential.

Defendant's mother's testimony was not contradicted. Skol could not recall whether or not defendant's mother was in the police station when he initially interviewed defendant and conceded that she may have been there. In any case, Skol stated he made no effort to inquire whether or not anybody came to the station to see defendant.

We do not believe such conduct by police is consistent with the great care required where a juvenile's incriminating statement is received. At worst, the police purposely precluded defendant's mother from contact with defendant by neglecting to see if defendant's mother had arrived until after such time as defendant had completed his confession. At best, the police simply subjected defendant to the same routine questioning of a criminal suspect without special regard for his youth. Either scenario is impermissible and casts some doubt over the voluntariness of defendant's statement.

In its brief, the State points out that the relevant inquiry is whether the absence of an adult interested in defendant's welfare contributed to the coercive circumstances surrounding the interview, not whether contact with a parent was denied, and cites *People v. Stachelek* (1986), 145 Ill. App. 3d 391, 495 N.E.2d 984, in support thereof. We agree, in principle, with that statement of the law, but conclude circumstances here are distinguishable from those in *Stachelek*.

In *Stachelek*, defendant, a 15-year-old juvenile, was arrested and taken to a police station shortly before 7 a.m. in the investigation of a stabbing death. He waited in an interview room until approximately 8:30 a.m., when a youth officer arrived. He was advised of his *Miranda* rights and informed that he could be tried as an adult. Nevertheless, defendant stated that he wanted to, and did, make a statement. The youth officer spoke with the defendant again at 1 p.m. Another oral statement was taken from defendant at 3:30 p.m. and a written statement at 4:30 p.m. that afternoon. Defendant's parents were not notified of his arrest.

At defendant's pretrial motion to suppress, the trial court concluded all of the statements were voluntarily given. However, the trial court determined that only the statements given at 3:30 and 4:30 p.m. were proper because of deficiencies in the *Miranda* warnings administered prior to defendant's initial statement. That ruling was affirmed on appeal.

In *Stachelek*, although defendant's parents were not notified of his arrest, defendant was afforded the opportunity to confer with a youth officer, an adult interested in his welfare, prior to making any statement. As stated above, no such actual opportunity was afforded

defendant in the instant case. That distinction from the instant case is crucial.

Parenthetically, we note that, although defendant argued on appeal, and the State addressed in response, the effect of the failure of the police to have a juvenile officer present during defendant's questioning under section 3—2 of the Juvenile Court Act (Act) (Ill. Rev. Stat. 1985, ch. 37, par. 703—2 (current version at Ill. Rev. Stat. 1987, ch. 37, par. 802—6)), our decision to reverse defendant's conviction should not be construed as founded on violation of that section. Indeed, the language of the Act does not require that a juvenile officer be present under the circumstances of an arrest as presented here.

Section 3—2 is labeled "Duty of officer—Admissions by minor." (Ill. Rev. Stat. 1985, ch. 37, par. 703—2.) Subsection (2) of section 3—2 of the Act, outlining the duty of law enforcement officers when a minor has been taken into custody without a warrant, is apparently the subsection addressed by both defendant and the State. Like subsection (1) of section 3—2, where custody is pursuant to a warrant, that duty includes the duty to take the minor to a juvenile police officer. (Ill. Rev. Stat. 1985, ch. 37, par. 703—2(2).) However, the language of section 3—2(2) refers only to situations where the minor is taken into custody without a warrant "under [s]ection 3—1." (Ill. Rev. Stat. 1985, ch. 37, par. 703—2(2).) Section 3—1 permits only "temporary custody" and only in three situations: where the minor is a person described in section 2—1 of the Act;[1] where the minor has been adjudged a ward of the court and has escaped from any commitment ordered by the court under the Act; or where the minor is found in the street or other public place and requires care, medical treatment, or hospitalization. (Ill. Rev. Stat. 1985, ch. 37, par. 703—1.) Further, subsection (3) of section 3—1 provides that "[t]he taking of a minor into temporary custody under [section 3—1] is not an arrest nor does it constitute a police record." (Ill. Rev. Stat. 1985, ch. 37, par. 703—1(3).) Thus, the failure to comply with section 3—2 is not fatal to the voluntariness of a minor's statement where the minor has been arrested pursuant to a criminal charge. See also *People v. Visnack* (1985), 135 Ill. App. 3d 113, 126, 481 N.E.2d 744, 753.

■ Here, however, the failure to have a juvenile officer present is material to determining the voluntariness of defendant's statement.

---

[1]Section 2—1 enumerates five different categories: "delinquent," "addicted," "requiring authoritative intervention," "neglected" or "dependent." (Ill. Rev. Stat. 1985, ch. 37, par. 702—1.) Each of those states is defined in the Act and none remotely includes a juvenile defendant who is arrested on a criminal charge.

That failure, in view of the failure to permit defendant's mother an opportunity to see her son at the police station, deprived defendant of his only chance to consult with any adult interested in his welfare prior to making a statement. Such is not the type of sensitivity to be accorded to receipt of a minor's statement.

We therefore reverse defendant's convictions and remand the matter for a new trial. Because we conclude reversal is proper on the basis that defendant's motion to suppress his confession was improperly denied, we need not address the other issues raised on appeal concerning the State's closing remarks and/or the length of defendant's sentence.

Reversed and remanded.

PINCHAM and COCCIA, JJ., concur.