693 N.E.2d 908 (1998)
295 Ill. App.3d 594
230 Ill.Dec. 430
In re L.L., a Minor (The People of the State of Illinois, Petitioner-Appellee
v.
L.L., Respondent-Appellant).
No. 2-96-0876.
Appellate Court of Illinois, Second District.
April 17, 1998.
*910 G. Joseph Weller, Deputy Defender, and Barbara R. Paschen (Court-appointed), Office of the State Appellate Defender, Elgin, for L.L.
Paul A. Logli, Winnebago County State's Attorney, Rockford, Martin P. Moltz, Deputy Director, State's Attorneys Appellate Prosecutor, Elgin, Howard M. Goldrich, Lincolnwood, for the People.
Justice RATHJE delivered the opinion of the court:
On April 1, 1996, the State filed a delinquency petition charging respondent, L.L., a 13-year-old minor, with one count of arson (720 ILCS 5/20-1(a) (West 1996)) and two counts of aggravated arson (720 ILCS 5/20-1.1(a)(2), (a)(3) (West 1996)) in connection with a fire set at a residence located at 2902 Collins Avenue in Rockford, on March 29, 1996. Respondent's motion to suppress the statements he made to the police at the police station during the night of March 30, 1996, was heard as part of the trial and was denied. Following the adjudicatory hearing, the trial court found that L.L. had committed two counts of aggravated arson and adjudicated him a delinquent minor. On July 3, 1996, the trial court ordered respondent committed to the Juvenile division of the Department of Corrections.
Respondent timely appeals, arguing that, under the circumstances of the interrogation at the police station where his parents were prevented from seeing him, his statements to the police were not voluntary and should have been suppressed. We agree for the reasons that follow. We reverse the judgment, and we remand the cause for a new adjudicatory hearing with directions to suppress respondent's statements.
We recite only the facts relevant to the circumstances under which respondent made his statements to the law enforcement officers. Investigator Greg Castronovo of the Rockford fire department testified that he investigated the fire at 2902 Collins Avenue on March 29. The fire took place at about 9:42 p.m. He had completed a four-day course as a juvenile officer. He focused his attention on the back porch of the residence that was consumed by the fire, sampling materials there because he had detected an odor of kerosene. The pattern of the burned area indicated to him that an accelerant might have been used to spread the fire. He found a blue plastic container and a clear white milk-type plastic container that would have been on the porch at the time of the fire.
Castronovo interviewed persons in the neighborhood. He spoke with Michelle Schmidt, who mentioned that respondent and his brother Charles had problems with Gary N., the grandson of Gerald Keen. Gary and Gerald were residents of the burned home. Gary led Castronovo to respondent as a suspect in setting the fire, telling Castronovo that respondent had been bragging about having started a fire at the residence on a previous date and had threatened to burn Gary's home. Castronovo asked Officer Patrick Hoey to accompany him to respondent's home. Respondent agreed to go to the Public Safety Building (police station or station) for questioning that night. They informed respondent's brother Charles and someone named Candy, who mentioned she might know where respondent's mother would be. At about 1 a.m., Castronovo was present *911 during a portion of the questioning of respondent by Detective Skaggs. The following morning respondent's pants, tennis shoes, and shirt were taken from him and tagged as evidence for testing (for residue).
Patrick Keehnen, a Rockford fire fighter and youth officer, arrived at the station at 12:30 a.m. and assisted Detective Skaggs in interviewing respondent at 1:20 a.m. on March 30. Skaggs read respondent his rights. Respondent initially could not understand why he was at the station to be interviewed about the fire, and as the interview progressed, respondent became more and more upset. In his first statement, respondent said he had been playing with friends and went over to Joey H.'s house. On his way home, they saw the fire. After further questioning, respondent changed some of the details of his account. The officers told him his own story was inconsistent and was also inconsistent with that of others at the scene, including his brother Charles. The officers told respondent he was lying and was trying to hide something.
Respondent made a second statement that was later reduced to writing and that resulted in his being charged. At about 4:30 a.m., respondent was transported for processing. He became angry that he was the only one being charged and said he was glad that the fire happened. In his second statement, respondent indicated that a boy named Paul went onto the porch and started the fire with kerosene. Keehnen also stated that respondent had a petroleum odor. Keehnen said he did not see respondent's mother until about 7:20 a.m. on March 30. He was aware that she was at the station when he came out of the interview room at about 2:30 a.m. Skaggs informed him that respondent's father and mother were both in the waiting room. Keehnen said he became aware that they arrived towards the end of the second statement.
According to the testimony regarding Keehnen's report, after the inconsistencies developed in respondent's first statement, Skaggs returned to inform them that respondent's parents had been contacted and were en route to the station. Skaggs had spoken to the parents when they called. Keehnen learned during the first part of the interview that respondent was 13 years old and was in the sixth grade. Toward the end of his second statement, he asked if his parents were coming to the station. The officers said yes. Keehnen did not ask respondent whether he was in a special education class. Respondent signed his Miranda warning at 1:24 a.m.
The court inquired of Keehnen whether respondent ever asked for a lawyer or asked to terminate the interview. Keehnen replied that he did not and that respondent spoke willingly. It was after respondent's inconsistencies were pointed out that he began to get upset and stated that his friends were wrong.
Keehnen then recounted respondent's second statement. Respondent said he wanted to tell the truth. Respondent met a person named Paul at the park where they were playing basketball. Paul told him that he did not like Gary and wanted to beat him up. As it began to get dark, Paul wanted to go up to Gary's house and do something to it possibly burn it down. Respondent, Willie "Too Tall" H. (Willie H.), Joey H., Charles, and Paul went to Gary's house. Paul said he wanted to burn it down. Respondent was with Paul when Paul ran up onto the back porch and the other three boys went across the street toward the alley. Paul took a plastic jug of kerosene and threw it over a red coat on a blue plastic container just to the left of the door and lighted it. The fire went up quickly.
When the officers asked respondent how he knew it was kerosene and why he had an odor about him, respondent then said he was on the porch trying to talk Paul out of starting the fire. They asked respondent hypothetical questions such as why they might find his fingerprints on a particular container of kerosene. He responded that they probably would because he struggled with Paul to stop him. Paul lighted the fire with a pink, childproof plastic lighter. When asked if he had such a lighter that Paul possibly got from him, respondent said no he had a pink plastic lighter but it was not childproof. When asked if there would be any reason why a neighbor might have seen him on the porch and not Paul, respondent replied that *912 he ran off the porch first and Paul ran off second and went in a different direction. Respondent went down the alley and ended up with his friends.
A few minutes after the officers obtained the written statement, respondent was informed that he was being charged. He became angry that he was the only one being charged. Respondent said he did not know Paul's last name or how to get in touch with him. While waiting to be processed, respondent was told that the police would be contacting Joey, Charles, and Willie to find out what they knew about Paul. Respondent answered that those "guys are so stupid that they will probably get the story all goofed up."
By talking to respondent's parents, the police later obtained the name of Paul S., who was a distant relative of respondent. Paul S., the possible suspect, and other alibi witnesses testified that Paul S. was elsewhere at the time of the incident and denied that Paul was at Collins Avenue that day. After further investigation, Keehnen was not able to find anyone who placed Paul S. at the scene of the fire with respondent.
The testimony of respondent and his brother attempted to implicate Joey as the person who lighted the fire. Respondent said that Joey was going to "hit" Gary. Respondent tried to talk Joey out of his plan. It was Joey who took the milk container that had kerosene in it, poured it on a coat atop a barrel on the porch, and set the coat afire. Respondent grabbed Joey's arm, trying to stop him, but Joey lighted the fire. Respondent then ran away and joined up with his brother. Respondent explained that when he was questioned by the police, he told them the fire had been started by Paul, because respondent at that time was sticking up for his friend Joey.
Respondent's father, David, testified that he and his wife went out to a restaurant with friends on the evening of the fire. Later that evening, he learned from his daughter that respondent had been taken into custody. David called the station, saying he was trying to find his son. Someone at the station responded that respondent was being questioned about the fire. David asked if he should get a lawyer and was told that it was entirely up to him. David and his wife returned home and called the station again. It was probably after 1 a.m. He spoke to a detective who said "I'm trying to * * * question [respondent] and I keep getting interrupted." That was the end of that conversation. David discussed the situation with his wife, and they decided that they should go down to the station to find out exactly what was going on. About 30 minutes later, they went to the station and asked someone at the desk where respondent was. Respondent's mother, Meridith, asked if she could see, respondent but was told she could not. They never saw respondent that night. (They only saw him the following week on Friday.) They sat and waited awhile. Sometime later, David learned from the detective that respondent was already charged with arson and was being taken to the detention center. Respondent's father and mother did not get home until sometime after 4 a.m.
Meridith, respondent's mother, testified that she thought they arrived at the station after 1 a.m. As soon as she saw one of the investigators, she said she wanted to talk to respondent. She was told that she could not and that he was being questioned. Meridith was upset and complained, using "a few choice words." The officer walked out of the room. She said that "[i]t felt like forever" and that they waited at the station about 1½ hours.
Detective Skaggs was called in rebuttal. He was aware respondent was 13 years old. He did not recall when respondent signed the formal written statement. Skaggs spoke with respondent's father several times over the telephone that night. He told David that he could come down. Skaggs was not sure, but he thought it was around 3 a.m. when David and his wife came to the station. Skaggs said the mother never asked to see respondent. Skaggs acknowledged that, if someone asked to speak to respondent at the front desk, he did not know if that message would have gotten to him.
Before ruling on the motion, the court recited that the time of the first statement, during which respondent told his first version *913 of events, was between 1:20 a.m. and 3:18 a.m. and then he changed his story to the one that resulted in the written version. The court noted that the interview process lasted an undue length of time and took place during the middle of the night. The discussions in the record suggest that the second statement was signed shortly after 4 a.m. The court found that Keehnen was the primary interrogator and did not stop the interrogation even though the parents had arrived. The court noted that it was apparent the parents were interested in what was transpiring but opined that it did not automatically follow that they had no other reason to come to the station other than to see their son.
Having considered the age and experience of respondent and the circumstances of the questioning and noting the presence of a youth officer, the court concluded that there was no coercion and that the statement was voluntary. However, the court also added that the youth officer was not interested in the minor's welfare.
We now address whether respondent's statements were involuntary under the totality of the circumstances and so should have been suppressed. A reviewing court will not disturb a finding by the trial court on the voluntariness of a confession or incriminating statement unless the finding is contrary to the manifest weight of the evidence. In re Lashun H., 284 Ill.App.3d 545, 551, 219 Ill.Dec. 823, 672 N.E.2d 331 (1996). When an incriminating statement is taken from a juvenile in the absence of counsel, great care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of one's rights, or of adolescent fantasy, fright, or despair. People v. Montanez, 273 Ill.App.3d 844, 853, 210 Ill.Dec. 295, 652 N.E.2d 1271 (1995); Lashun, 284 Ill.App.3d at 550, 219 Ill.Dec. 823, 672 N.E.2d 331. In cases involving juveniles, courts must be particularly careful in scrutinizing the record, since juveniles can be easy victims of the law; the voluntariness of a juvenile's confession is determined by the totality of the circumstances. People v. Travis, 122 Ill.App.3d 671, 674, 677, 78 Ill.Dec. 535, 462 N.E.2d 654 (1984). The State has the burden of showing by a preponderance of the evidence that the confession was made knowingly and intelligently. In re J.J.C., 294 Ill.App.3d 227, 237, 228 Ill.Dec. 751, 689 N.E.2d 1172 (1998); In re J.E., 285 Ill.App.3d 965, 974, 221 Ill.Dec. 249, 675 N.E.2d 156 (1996).
A test of voluntariness is whether the statement was made freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time of the confession. In re J.J.C., 294 Ill.App.3d at 237, 228 Ill.Dec. 751, 689 N.E.2d 1172. Factors that are considered include the age, education, intelligence, or emotional characteristics of the accused; previous experience with the criminal justice system; the duration of the questioning; whether the accused was informed of his constitutional rights or was subjected to physical punishment; offers of leniency or other promises to induce a confession; prior refusals to answer questions; and falsely aroused sympathy. J.J.C., 294 Ill.App.3d at 238, 228 Ill.Dec. 751, 689 N.E.2d 1172.
In cases involving juveniles, additional factors must be considered, such as the time of the questioning and the presence of a parent or other adult concerned about the juvenile's welfare. J.J.C., 294 Ill.App.3d at 238, 228 Ill.Dec. 751, 689 N.E.2d 1172; Lashun, 284 Ill.App.3d at 551,219 Ill.Dec. 823, 672 N.E.2d 331. The voluntariness of a statement or confession is determined by the particular circumstances of each case. See J.J.C., 294 Ill.App.3d at 238, 228 Ill.Dec. 751, 689 N.E.2d 1172.
Section 5-6(2) of the Juvenile Court Act of 1987 includes a requirement that a law enforcement officer who takes a minor into custody makes an immediate and reasonable attempt to notify the minor's parents or other person legally responsible for the minor's care; the officer must without unnecessary delay take the minor to the nearest juvenile police officer designated by the statute for such purposes. 705 ILCS 405/5-6(2) (West 1996). The ostensible purpose of the notice requirement is "to allow, where possible, the concerned adult to confer *914 and counsel with the juvenile before interrogation and confession." Montanez, 273 Ill. App.3d at 850, 210 Ill.Dec. 295, 652 N.E.2d 1271. Although the presence of a juvenile officer is a significant factor in assessing the voluntariness of a statement, the presence of such an officer does not per se make the confession voluntary. People v. Fuller, 292 Ill.App.3d 651, 665, 226 Ill.Dec. 657, 686 N.E.2d 6 (1997).
Similarly, while we have recognized that a juvenile detainee has no per se right to consult with a parent or guardian, the failure to have present an adult or parent demonstratively interested in the juvenile's welfare, prior to or during questioning, is material to determining the voluntariness of the minor's statement. Montanez, 273 Ill.App.3d at 852, 210 Ill.Dec. 295, 652 N.E.2d 1271; People v. Knox, 186 Ill.App.3d 808, 815-16,134 Ill.Dec. 564, 542 N.E.2d 910 (1989).
Courts have repeatedly held that police conduct that frustrates a parent's attempts to confer, with his child prior, to or during questioning is significant in determining the voluntariness of a confession. Lashun, 284 Ill.App.3d at 553, 219 Ill.Dec. 823, 672 N.E.2d 331. In In re V.L.T., 292 Ill. App.3d 728, 226 Ill.Dec. 700, 686 N.E.2d 49 (1997), this court concluded that the statement made by a 10-year-old minor was involuntary and should have been suppressed where the police failed to provide her with the opportunity to confer with an adult interested in her welfare (her grandmother), she had little prior contact with the police, and she was subjected to lengthy questioning while she was deprived of sleep, food, and proper attire.
In J.J.C., this court held that, when a juvenile's parents are present, request to confer with their child, and are effectively refused access to the child, the presumption arises that the juvenile's will is overborne. J.J.C., 294 Ill.App.3d at 239, 228 Ill.Dec. 751, 689 N.E.2d 1172. In J.J.C., & youth officer was present during the interrogation, but the record was silent regarding the officer's conduct in protecting the respondent's rights. Although the parents went to the police station and notified an officer of their presence and desire to confer with their child, the officer's response was to tell them to sit and wait, which they did, for more than an hour. Even after the wait, they were not allowed to see their child for the remainder of the evening. The minor was a 16-year-old with learning disabilities who was attending special education classes and who had had minimal prior contacts with the police. He was ultimately found responsible for criminal sexual assault. He had stated to the police during the interview that the matter was none of their business.
We determined in J.J.C. that the juvenile's incriminating statement to the police was involuntary in part because the police clearly frustrated the parents' attempts to confer with their child prior to or during questioning. In considering the totality of the circumstances, we concluded that the trial court's decision not to suppress the statement was against the manifest weight of the evidence. The adjudication of delinquency was reversed and the cause was remanded for further proceedings.
In People v. Brown, 182 Ill.App.3d 1046, 131 Ill.Dec. 534, 538 N.E.2d 909 (1989), the court explained:
"[T]he officers who know of the parent's presence have an affirmative duty to inform those actually questioning a juvenile of the parent's presence and request to see her child. And, in order to ensure the true voluntariness of a statement, those questioning the juvenile have an affirmative duty to stop the questioning and allow the parent to confer with her child." Brown, 182 Ill.App.3d at 1053-54, 131 Ill.Dec. 534, 538 N.E.2d 909.
In In re J.O., 231 Ill.App.3d 853, 855, 173 Ill.Dec. 406, 596 N.E.2d 1285 (1992), the court stated that, if parents have indicated an interest by their presence, they should be allowed to confer with their children before any questioning begins, as well as be present when any questioning occurs.
In the present case, we conclude that the decision not to suppress respondent's incriminating statement was against the manifest weight of the evidence. After examining the totality of the circumstances, we cannot deem the statement voluntary. *915 Our decision finds support in such cases as In re J.J.C., 294 Ill.App.3d 227, 228 Ill.Dec. 751, 689 N.E.2d 1172, In re V.L.T., 292 Ill.App.3d 728, 226 Ill.Dec. 700, 686 N.E.2d 49, In re Lashun, 284 Ill.App.3d 545, 219 Ill.Dec. 823, 672 N.E.2d 331, and People v. Knox, 186 Ill.App.3d 808, 134 Ill.Dec. 564, 542 N.E.2d 910. Here, the 13-year-old minor, who was in a special education class and had apparently limited mental abilities, was taken from his home late at night at a time when the officers were aware that his parents were not readily available. He was interrogated for a lengthy period of time (nearly three hours) during the middle of the night, while he was obviously sleep deprived. Detective Skaggs spoke with respondent's father more than once over the telephone. The father was clearly interested in the welfare of his son. The parents were reasonably prompt in going to the station, and the mother asked to see her son but was refused. At one point during the interrogation, respondent also asked if his parents were coming, showing he too was interested in seeing them.
Respondent's mother testified that, when she asked to talk to respondent and was refused, she became upset and complained. She and her husband were made to wait about 1½ hours. She thought it "felt like forever." Her testimony regarding the time is not inconsistent with that of the officers who testified that she was present at the station sometime between 2:30 a.m. and 3 a.m. She and her husband did not get home until sometime after 4 a.m.
The testimony centered on when the parents were available at the station during the questioning particularly in relation to the timing of respondent's second, more incriminating statement that was reduced to writing. It appears that the formal questioning began with the Miranda warnings at 1:24 a.m. Keehnen testified he was aware of Meridith's presence at the station as early as about 2:30 a.m., because Skaggs had informed him that the parents were in the waiting room at that time. Skaggs had learned that the parents were en route after the inconsistencies in respondent's story developed during his first statement. Skaggs testified that he thought it was around 3 a.m. when the parents came to the station. Although he denied that Meridith asked to see her son, he also testified that he could not be sure that such a message would have gotten to him.
The court noted that the first (discredited) statement was given sometime between 1:20 a.m. and 3:18 a.m., and then respondent changed his story and gave the second statement. This second incriminating statement must have been given and reduced to writing sometime between 3:18 a.m. and 4 a.m. The discussions in the record indicate that the final statement was signed a few minutes after 4 a.m. We believe the evidence shows that the second statement was being given at a time when the parents were available (having been present as early as 2:30 a.m.) and were interested in conferring with their son. We cannot accept the implied theory that the parents were not directly interested in seeing and conferring with their son. Why else would a parent drive to the police station in the middle of the night? See In re J.O., 231 Ill.App.3d at 854,173 Ill.Dec. 406, 596 N.E.2d 1285.
It also appears that the law enforcement officials were evasive, in their conduct and completely frustrated the parents' attempts to see and confer with respondent. Furthermore, the record and the comments of the trial court show that no youth officer demonstrated any interest in the minor's welfare. Rather, the relationship of the youth officer appears to have been adversarial and antagonistic toward respondent. When the officers learned of the parents' interest in the welfare of their sonmost particularly when they were aware of their presence at the station the officers had an affirmative duty to stop the questioning and allow the parents to confer with their child.
The trial court tended to focus on the lack of overt coercion or threats. The absence of overt coercion or threats does not mean that the statement was voluntary under the circumstances. While we believe the trial court was diligent in attempting to arrive at a correct ruling, we have taken a different view of the factors and the evidence. We have had the advantage of time to study the record *916 in detail and to consider the most recent case law in arriving at our decision. Although we arrive at our conclusion by considering several factors under the totality of the circumstances test, we point out that the law enforcement officers' conduct here in frustrating the access of the parents to their child is a material factor in our decision. The State did not meet its burden of showing that respondent's statements were voluntary. Any statements taken from respondent during his detention on March 30, 1996, must therefore be suppressed.
Because we are remanding the cause for further proceedings, we have also considered the sufficiency of the evidence. We conclude that there is no double jeopardy problem that would foreclose a retrial. However, this conclusion must not be construed as a determination of guilt or innocence that would be binding on retrial. See People v. Taylor, 76 Ill.2d 289, 309-10, 29 Ill.Dec. 103, 391 N.E.2d 366 (1979); J.J.C., 294 Ill.App.3d at 239, 228 Ill.Dec. 751, 689 N.E.2d 1172. Since we have determined that respondent's statements were not voluntary, the adjudication of delinquency must be reversed. The cause is remanded for a new adjudication hearing with directions to suppress all of respondent's statements to law enforcement officials while he was detained on March 30, 1996.
In this circumstance, where the trial court has previously adjudicated respondent a delinquent minor, we think it is most efficacious that this cause be remanded to a different trial judge who has no familiarity with the case.
The judgment of the circuit court of Winnebago County is reversed, and the cause is remanded with directions.
Reversed and remanded with directions.
GEIGER, P.J., and McLAREN, J., concur.