THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY T. ROBINSON, Defendant-Appellant.

Second District    No. 2—97—0371

Opinion filed December 31, 1998.

G. Joseph Weller and Jack Hildebrand, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Robert J. Morrow, of Elgin, for the People.

PRESIDING JUSTICE GEIGER delivered the opinion of the court:

Following a jury trial, the defendant, 14-year-old Anthony T. Robinson, was found guilty of involuntary manslaughter (720 ILCS 5/9—3(a) (West 1996)) and criminal damage to property (720 ILCS 5/21—1 (West 1996)). He was sentenced to four years' imprisonment. On appeal, the defendant contends that the trial court erred when it (1) denied his motion to suppress his confession; and (2) denied his motion to transfer his case to juvenile court. We reverse and remand.

Prior to trial, the defendant moved to suppress the oral and written statements that he made while he was in police custody on July 1, 1996. At the suppression hearing, Officer Richard Davis of the Waukegan police department testified on behalf of the State. Officer Davis testified that, at 4 a.m. on July 1, 1996, he was called to investigate a house fire in Waukegan which had resulted in the death of a baby. Various witnesses saw the defendant and an individual named James Brown at the scene of that particular incident as well as other "garbage can fires" that occurred the same evening.

Officer Davis and two other detectives went to the defendant's home at 10 a.m. that day. When they arrived at the defendant's home, they told his mother, Estelle Robinson, that they wanted to talk to him. Estelle told the officers that the defendant had just gotten home after being out all night. When she asked why they wanted to speak to the defendant, Officer Davis advised Estelle that the defendant was

implicated in three separate fires and that a person had been hurt during one of the fires. Officer Davis told Estelle that he wanted to question the defendant to find out the extent of his involvement in these incidents. He testified that he went into the defendant's bedroom and found him lying in bed. The officers then took the defendant to the police station without handcuffs.

When they arrived at the police station, Officer Davis escorted the defendant to an interview room, patted him down, and, as a precaution, asked him to remove his shoes. Officer Davis and the defendant were the only individuals present in the room. Officer Davis then asked the defendant if he knew why he had been brought to the police station. According to Officer Davis, the defendant replied, "[B]ecause of the baby."

Officer Davis told the defendant that the police were questioning Brown. Officer Davis explained that he wanted to find out about the defendant's involvement in the fires. He then presented the defendant with a waiver form and advised him of his rights. The defendant told Officer Davis that he understood his rights. Officer Davis then had the defendant read the entire form out loud. The defendant could not pronounce the word "coercion" and did not know the meaning of that word. Officer Davis explained that the word "coercion" means that "nobody forced you or beat you or threatened you to sign the form [or] do anything that you didn't want to do." After Officer Davis's explanation, the defendant signed the form.

Officer Davis then asked the defendant what had happened on the night in question. The defendant told him that, at 10 p.m., he and Brown walked by a garage and saw a gas can. The defendant took the gas can, and then he and Brown decided to "light some fires." They walked to the back of a nearby house, and the defendant poured gas on the house, the garbage can behind the house, and on the grass surrounding the garbage can. The defendant then told Brown to light the fire. After Brown started the fire, the defendant tried to extinguish it. However, the defendant was unable to put out the fire, and eventually he and Brown left the scene.

The defendant told Officer Davis that, after setting the first fire, two boys who were riding bicycles began to chase them. After eluding the two boys, the defendant and Brown went to a nearby alley where they started a second fire in another garbage can. After they watched this second fire, they went to another alley and started a third fire in yet another garbage can.

After describing these events to Officer Davis, the defendant identified Brown's photograph. The defendant then wrote a statement. In this statement, he wrote that he and Brown had decided to

"burn some garbage cans but *** no house." After Officer Davis read the defendant's handwritten statement, he asked the defendant why he failed to state that he had poured gasoline on the house in question. The defendant replied that he was afraid. The defendant then signed the statement.

Officer Davis also testified that he typed the oral statement that the defendant made to him. After typing this statement, Officer Davis read it to the defendant. The defendant made three corrections to the statement and then signed the typed statement.

On cross-examination, Officer Davis testified that, while he was at the defendant's house, he did not explain to his mother that the defendant would be asked to waive his rights. In addition, he did not tell her that the defendant was under arrest.

The State also presented the testimony of Officer Irwin Grimes of the Waukegan police department. Officer Grimes testified that, in 1992, he took the defendant into custody for an unrelated incident and advised him of his rights. On that occasion, the defendant chose to waive his rights. Following his waiver, Officer Grimes took a statement from the defendant. Officer Grimes could not recall if the defendant was given a station adjustment or if his case was sent to juvenile court. According to Officer Grimes, when a statement adjustment is given, no further action is taken against the defendant.

The State next presented the testimony of Officer Michael Donnenwirth, a juvenile detective for the Waukegan police department. Officer Donnenwirth testified that, on June 25, 1996, he questioned the defendant regarding the theft of a dog. Prior to questioning the defendant, Officer Donnenwirth asked him to review a waiver form. Officer Donnenwirth testified that the defendant told him that he did not understand the sixth right on the form, which stated as follows:

"As a juvenile, you must also understand that anything you say can and may be used against you in a subsequent criminal proceeding if the case is transferred from the juvenile court to an adult criminal proceeding after an appropriate hearing in juvenile court."

In response, Officer Donnenwirth told the defendant that "if he did something really bad like a murder, he could be tried in adult court." The defendant stated that he understood Officer Donnenwirth's explanation. Officer Donnenwirth further testified that the defendant could not pronounce the word "coercion" and did not know what that particular word meant. In response, Officer Donnenwirth explained that "coercion" meant that "you haven't been promised or threatened in anyway." The defendant indicated that he understood the explanation, signed the waiver form, and gave Officer Donnenwirth a statement. Afterwards, he was released to a relative. Officer Donnenwirth never appeared in court concerning the matter.

The defendant presented the testimony of his mother, Estelle Robinson. Estelle testified that, when the officers arrived at her house on July 1, 1996, she did not give them permission to look for the defendant. According to Estelle, Officer Davis spoke to her in the living room while the other officers walked into the defendant's bedroom. When Estelle asked Officer Davis what the defendant had done, he told her that he did not know but that he wanted to question the defendant because "somebody had implicated him in setting some trash cans afire." She testified that she was never told that a house had caught on fire or that a child had been killed.

When Estelle asked Officer Davis if she needed to go to the station with the defendant, Officer Davis responded that she did not need to go because they were just going to ask him a few questions. She testified that she did not own a car on that date. However, at about 12 p.m. that day, she called the police station and asked to speak with Officer Davis. She testified that she was told that he was busy questioning the defendant. She further testified that the defendant was in special education classes and that he had never been to court.

The defendant also presented the testimony of clinical psychologist Gerard Girdaukas. Girdaukas testified that, on July 10, 1996, he administered a battery of tests to the defendant and conducted a clinical interview. He determined that the defendant had an intelligence quotient (IQ) of 49 and that his IQ was lower than the IQ of 99% of his peers. Furthermore, Girdaukas determined that the defendant functioned within the mentally retarded range and suffered from attention deficit hyperactive disorder (ADHD).

Girdaukas opined that, based upon his evaluation, the defendant was not able to knowingly and intelligently waive his rights. He testified that the defendant was unable to comprehend some of the words on the waiver form and that he did not understand the significance of waiving his rights. Girdaukas stated that the defendant would not be able to comprehend the waiver form even if someone read it to him. According to Girdaukas, no amount of explanation would have helped the defendant understand the waiver form.

The defendant also presented the testimony of clinical psychologist Marva Dawkins. Dawkins testified that, on November 20, 1996, she interviewed the defendant and administered a battery of tests. She specifically questioned the defendant about the statement of rights. She asked the defendant about his right, as a juvenile, to consult with his parents or a legal guardian prior to questioning and the right to have them present during questioning. The defendant responded, "First a juvenile is where they keep kids that commit crimes. My mom can testify against me, stand by my side. I can talk to

my parents before I go to court or to juvenile." Dawkins also questioned the defendant about the meaning of the following statement: "[A]nything you say can and may be used against you in a subsequent criminal proceeding if the case is transferred from the juvenile court to an adult criminal proceeding after an appropriate hearing in juvenile court." The defendant replied, "That means I will be transferred to adult court." Dawkins next asked the defendant what it meant to waive his rights. The defendant responded, "That means to stand by them." When Dawkins asked the defendant what he meant by that particular definition, the defendant could not tell her anything further.

Dawkins concluded that the defendant's reading and writing skills were at a third- or fourth-grade level. She testified that he was functioning at a low level of mental retardation and that he had reached his learning peak. She opined that the defendant was not able to understand the statement of rights and that he could not knowingly and intelligently waive his rights. Furthermore, according to Dawkins, the defendant was not capable of understanding abstract concepts, and that no amount of explanation would have allowed him to appreciate "what he was giving up by waiving his Miranda rights." Dawkins also opined that, based upon the defendant's two prior encounters with the police, he would have expected to be released if he cooperated with them.

Following the hearing, the trial court denied the defendant's motion to suppress, finding that his statements to the police were voluntary. The trial court noted that no coercive acts occurred during the defendant's interrogation. In addition, the trial court found that the defendant made a knowing and intelligent waiver of his rights. The trial court explained its ruling as follows:

"Defendant's inability to define the word 'waiver' in my opinion is not relevant as long as he knows what the concept is. And from the evidence here, I think he understands what the concept is, and the State has shown that he understands the concept is you got a right not to talk, but if you do talk, they are going to use it against you in a court. Or you have a right to ask for a lawyer. If you don't ask for a lawyer, we are going to go ahead without. I think the evidence shows the defendant understood these concepts."

On September 24, 1996, following a hearing, the defendant's case was transferred to criminal court. The defendant was prosecuted on charges of first degree murder (720 ILCS 5/9—1(a)(2), (a)(3) (West 1996)) and aggravated arson (720 ILCS 5/20—1.1(a)(1), (a)(2) (West 1996)). However, he was convicted of involuntary manslaughter (720 ILCS 5/9—3(a) (West 1996)) and criminal damage to property (720

ILCS 5/21—1 (West 1996)) and was sentenced to four years' imprisonment. After his conviction, the defendant filed a motion for new trial and a motion to transfer his case to juvenile court for sentencing. Following the denial of his posttrial motions, the defendant filed a timely notice of appeal.

On appeal, the defendant contends that the trial court erred in denying his motion to suppress. Specifically, the defendant contends that his confession was not voluntary. Furthermore, he contends that, prior to being questioned, he was not given an opportunity to confer with an adult who was interested in his welfare.

■ The State has the burden of showing by a preponderance of the evidence that the confession was made knowingly and intelligently. *In re L.L.*, 295 Ill. App. 3d 594, 600 (1998). A reviewing court will not disturb a finding by the trial court on the voluntariness of a confession or incriminating statement unless the finding is contrary to the manifest weight of the evidence. *L.L.*, 295 Ill. App. 3d at 600.

■ In determining whether a statement has been voluntarily given, we must look at the totality of the circumstances. *In re J.J.C.*, 294 Ill. App. 3d 227, 234 (1998). Factors to consider include the age, education, and intelligence of the accused, the duration of questioning, and whether the accused was informed of his constitutional rights or was subjected to any physical punishment. *L.L.*, 295 Ill. App. 3d at 600. Other relevant aspects to be considered include the previous experience of the accused with the criminal justice system, the emotional characteristics of the accused, and whether the confession was induced by police deception. *J.J.C.*, 294 Ill. App. 3d at 234.

In cases involving juveniles, additional factors must be considered, including the time of the questioning and the presence of a parent or other adult concerned about the juvenile's welfare. *L.L.*, 295 Ill. App. 3d at 600. The failure to have present an adult or parent demonstratively interested in the juvenile's welfare, prior to or during questioning, is material to determining the voluntariness of the minor's statement. *L.L.*, 295 Ill. App. 3d at 601.

■ Section 5—6(2) of the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/5—6(2) (West 1996)) provides that an officer who takes a minor into custody shall immediately make a reasonable attempt to notify his parent and shall take the minor to the nearest juvenile officer without unnecessary delay. The purpose of this notice requirement is " 'to allow, where possible, the concerned adult to confer and counsel with the juvenile *before* interrogation and confession.' " (Emphasis in original.) *L.L.*, 295 Ill. App. 3d at 601, quoting *People v. Montanez*, 273 Ill. App. 3d 844, 850 (1995).

In examining the defendant's confession in the instant case, we

are guided by this court's recent holding in *In re J.J.C.*, 294 Ill. App. 3d 227 (1998). In that case, the trial court denied the juvenile defendant's motion to suppress his confession. *J.J.C.*, 294 Ill. App. 3d at 233. The defendant in *J.J.C.* was 16 years old, suffered from ADHD, and attended special education classes. *J.J.C.*, 294 Ill. App. 3d at 238. His prior contacts with the police had only consisted of station adjustments. *J.J.C.*, 294 Ill. App. 3d at 238. During the defendant's interrogation, a juvenile officer was present. *J.J.C.*, 294 Ill. App. 3d at 237. In addition, the defendant's parents went to the police station and notified an officer of their presence and desire to confer with the defendant. *J.J.C.*, 294 Ill. App. 3d at 237. However, the defendant's parents were not allowed to see the defendant on that particular evening. *J.J.C.*, 294 Ill. App. 3d at 237. During the interview, the defendant allegedly told the police that the matter was none of his parents' business. *J.J.C.*, 294 Ill. App. 3d at 237.

On appeal, we determined that the defendant's confession to the police was involuntary. *J.J.C.*, 294 Ill. App. 3d at 238. We noted that, while a juvenile's purported desire not to have his parents present during an interrogation is certainly a factor in determining voluntariness, it is only one of many factors to consider. *J.J.C.*, 294 Ill. App. 3d at 237. We further noted that, although a juvenile officer was present during the defendant's interrogation, the record did not indicate that the officer had affirmatively protected his rights. *J.J.C.*, 294 Ill. App. 3d at 237. Moreover, we determined that the defendant's previous station adjustments would not have given him the necessary sophistication or insight as to how to conduct himself while being interrogated by police. *J.J.C.*, 294 Ill. App. 3d at 238.

More importantly, we noted that the police in *J.J.C.* had clearly frustrated the parents' attempts to confer with the defendant prior to or during questioning. *J.J.C.*, 294 Ill. App. 3d at 237. We held that, when law enforcement authorities refuse to honor the parents' requests to confer with their child, it will be presumed that the juvenile's will was overborne. *J.J.C.*, 294 Ill. App. 3d at 237.

■ In light of such authority and after a careful review of the circumstances presented in the case at bar, we conclude that the defendant's confession was not voluntary. The defendant in the instant case was taken to the police station where he signed a written confession. However, as was the case in *J.J.C*, at no time was the defendant permitted to confer with a parent before he was questioned or before he made his confession. As noted above, the failure to have the presence of an adult or parent demonstratively interested in the juvenile's welfare, prior to or during questioning, is material in determining the voluntariness of the minor's statement. *L.L.*, 295 Ill. App. 3d at 601.

In further support of our conclusion, we note that Officer Davis admitted during the suppression hearing that he did not inform the defendant's mother that the defendant would be asked to waive his rights. In addition, the defendant's mother testified that, when she asked Officer Davis if she needed to accompany the defendant to the police station, he told her that she did not need to go with him. She further testified that she did not own a car at the time, but that she later called Officer Davis after the defendant was taken to the police station. However, she was unable to speak with Officer Davis and was told that he was busy questioning the defendant. Such evidence indicates that, although the defendant did not ask to confer with a parent, his mother indicated an interest in conferring with him and Officer Davis at the police station.

In addition, the defendant herein did not meet with a juvenile officer prior to questioning. Section 5—6(2) of the Act specifically provides that an officer who takes a minor into custody shall take him to the nearest juvenile officer without unnecessary delay. 705 ILCS 405/5—6(2) (West 1996); *L.L.*, 295 Ill. App. 3d at 601. As the defendant herein was not taken to a juvenile officer prior to his interrogation, we are compelled to conclude that sufficient care was not taken to assure that his statement was free from compulsion. See *People v. Knox*, 186 Ill. App. 3d 808, 813 (1989).

In determining whether the defendant's statement was voluntary, we must also consider his age and mental capacity. See *L.L.*, 295 Ill. App. 3d at 600. The evidence at the suppression hearing indicates that the 14-year-old defendant functioned within the mentally retarded range and suffered from ADHD. Dawkins testified that the defendant's reading and writing skills were at a third- or fourth-grade level, and the defendant's mother testified that he attended special education classes. After considering the defendant's limited mental capacity, his custody status, the failure to have an adult interested in his welfare present during the interview process, and the other circumstances attendant to the confession, we conclude that the defendant did not knowingly and intelligently waive his *Miranda* rights. We therefore believe that the trial court's decision was against the manifest weight of the evidence.

The State points to the lack of overt coercion and the defendant's prior contacts with the police as support for the trial court's ruling that his confession was voluntary. However, the absence of overt coercion does not necessarily mean that the statement was voluntary under the circumstances. See *L.L.*, 295 Ill. App. 3d at 604. Furthermore, we do not believe that the defendant's prior experiences with the police led to an understanding of his rights. Rather, as in *J.J.C.*,

the defendant in the case at bar could have been led to believe that this occasion would be no different from the other times when he was brought in, admonished, and released. See *J.J.C.*, 294 Ill. App. 3d at 238.

For all of these reasons, we conclude that the defendant's confession was not voluntary. We therefore remand this cause for a new trial with directions to suppress the defendant's oral and written statements to law enforcement officials while he was detained on July 1, 1996. In addition, in light of the unique facts of this case and because the juvenile court explicitly considered the defendant's confession during his transfer hearing, we further instruct that this cause be transferred to the juvenile court for a new transfer hearing.

Because we are remanding this cause for further proceedings, we have also considered the sufficiency of the evidence. We believe that the evidence presented at trial was sufficient to support the defendant's conviction for involuntary manslaughter and criminal damage to property. However, this conclusion must not be construed as a determination of guilt or innocence that would be binding on retrial. *L.L.*, 295 Ill. App. 3d at 604.

For the foregoing reasons, the judgment of the circuit court of Lake County is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

BOWMAN and HUTCHINSON, JJ., concur.