708 N.E.2d 806 (1999)
303 Ill. App.3d 412
237 Ill.Dec. 3
In re D.B., a Minor (The People of the State of Illinois, Petitioner-Appellee,
v.
D.B., a Minor, Respondent-Appellant).
No. 1-97-3179.
Appellate Court of Illinois, First District, Fifth Division.
March 12, 1999.
*808 Nan Ellen Foley, Chicago, for Appellant.
Richard A. Devine, State's Attorney of Cook County, Chicago (Renee Goldfarb, Arleen C. Anderson, Kimberly J. Anderson, of counsel), for Appellee.
Justice GREIMAN delivered the opinion of the court:
Respondent D.B. was adjudicated delinquent of armed robbery and robbery and committed to the Department of Corrections. On appeal, D.B. contends that his adjudications must be reversed because he received ineffective assistance of counsel where his attorney failed to make certain arguments as to the voluntariness of his statements to the police. D.B. also contends that the case must be remanded for a new dispositional hearing because the trial court did not have a written social investigation report.
In February 1997, two petitions were filed alleging D.B. to be delinquent. One petition alleged that D.B. committed the offense of robbery on February 24, 1997, and the other petition alleged that he committed the offense of attempted robbery on February 17, 1997. The State subsequently amended the second petition to add counts for attempted armed robbery and armed robbery.
D.B.'s attorney filed a motion to suppress statements made by D.B. The motion alleged that: (1) no reasonable suspicion existed to justify the stop and seizure of D.B. and to justify a custodial investigation; (2) no probable cause existed to justify the belief that D.B. committed any crime; (3) once arrested, D.B. was not given his rights, pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the police did not otherwise assure him of his right to counsel; (4) D.B. was coerced by the police in that he was told he had to indicate whether he was a lookout or a principal and he made involuntary statements; and (5) the illegal arrest tainted the subsequent identifications by the victims.
On June 27, 1997, the trial court heard evidence regarding the propriety of the arrest. Officer Raymond Cowell testified that on February 25, 1997, he and his partner, Officer Ciukowski, observed D.B. and another person approaching a third individual who was walking toward a car. Ciukowski exited the vehicle and began watching D.B. and his friend. Ciukowski notified Cowell that the individual whom D.B. and his friend were following had entered a car but D.B. and his friend did not approach the car. Ciukowski told him that D.B. and his friend then began running up behind him. Before reaching Ciukowski, another unmarked unit stopped D.B. and his friend. Cowell went to the location and asked D.B. why he was in the area. D.B. informed Cowell that he and his friend planned to take Ciukowski's wallet and beat him. Cowell informed D.B. of his arrest and immediately informed D.B. of the Miranda warnings.
*809 On cross-examination, the officer stated that at the time he was assigned to patrol the area, he had received two robbery case reports, one dated February 17 and one dated February 24. The area he was assigned to patrol was the area in which the prior robberies had occurred. Cowell stated that D.B. and his friend wore clothing similar to that described in the February 24 case report and matched the general descriptions of the offenders. Further, both case reports indicated that the robberies occurred as the victims were walking to their cars and at about the same time in the evening, around 7 or 8 p.m. Because he recognized the similarity between the situations, the officers stopped to follow D.B.
D.B. admitted having a conversation with Cowell but denied telling Cowell that he was about to take Ciukowski's wallet. He stated that he and his friend were just walking and they did not have on the clothing that the officer described. The trial court denied the motion to suppress based on questions as to the propriety of the arrest.
On June 30, 1997, the court conducted a hearing on the remaining issues of the motion to suppress. Officer Cowell testified that when he first arrived after the stop, he and Ciukowski took D.B. across the street to conduct a field interview. D.B. informed him that he and his friend were planning to take Ciukowski's wallet and beat him. Cowell informed D.B. that he was under arrest, and Ciukowski informed him of his rights. D.B. stated that he understood his rights. Cowell put D.B. in his car and asked him if he knew of any street robberies in the area. D.B. stated that he did. Cowell never told him that he had to talk to him, and he never told D.B. that he had to indicate whether he was a lookout or a principal in these robberies. No one in Cowell's presence ever said that to D.B.
Detective Peter Bukiri testified that on February 25, 1997, he was assigned to a robbery investigation. When he approached D.B. to speak with him, D.B. began talking to him and telling him that he was involved in a robbery. Bukiri stopped him and said, "[l]et me tell you your rights." Bukiri read him his rights and D.B. told him that he understood his rights. They then spoke about the February 24 and 17 incidents. Bukiri did not tell D.B. that he had to talk to him, and he did not tell D.B. that he had to indicate whether he was a principal or a lookout.
D.B. testified that after he and his friend were stopped by the police, the officers stated that they had been stopped for two robberies. Cowell stated that D.B. was under arrest. Cowell did not tell D.B. that he had to speak to him, but D.B. stated that he was not given the Miranda warnings. After D.B. and his friend were searched, Cowell put D.B. in the car and said that they were caught for robberies and asked D.B. if he was the robber. D.B. told him that he was not the robber. Cowell told him that a woman had identified him. Then Cowell said that D.B. had something to do with it and asked whether he wanted to be put down for the robbery or the lookout. D.B. told the officer that he had nothing to do with the robbery. Cowell asked him again which role, and D.B. said "[p]ut me down as the lookout."
The court asked D.B. if he was ever given the Miranda warnings. D.B. said "no." However, D.B. stated that when Bukiri started talking to him, he asked if D.B. wanted to call his mother or have a lawyer and D.B. said "no." D.B. denied first talking to Bukiri about the robberies. After Bukiri asked D.B. if he wanted to call his mother, Bukiri asked him if he knew that he was there because of two robberies. D.B. said, "yes," because the police officers had told him that information. Bukiri started asking him what happened. D.B. told him that he left so he did not know what happened. Bukiri asked what D.B. wanted him to put on the paper. D.B. again stated that he did not have anything to do with it, but Bukiri told him that he had to put something down because a woman identified him. D.B. told him to "just put me down as the lookout." He said this because Bukiri told him that, if he put him down for the robbery, it was going to be harder on him.
On cross-examination D.B. testified that he was talking to the officer in the car on the way to the station because he wanted to know what was going on. He denied initiating the conversation.
*810 The court found that D.B. was given his Miranda rights at the scene by the officers and that the detective at the station also gave him his rights. The court found that D.B. "was not coerced in any fashion" "[a]nd that he simply talked." The court denied the motion to suppress.
During the bench trial on the February 24 incident, the complainant testified that D.B. and another man approached her as she was walking to her car. D.B. asked if she had any change and she said "no." He looked at her car keys and demanded the keys. He asked for the keys again and said, "I have a gun. If you don't give me your car keys, I will shoot." She took a few steps back and he repeated the threat. The other man, who stood behind D.B., yelled, "[g]o ahead and shoot her." D.B. said, "[g]ive me your purse." She reached for the strap. He took the purse and ran away.
Arlene Adamson, a youth investigator, testified that on February 25, 1997, she was assigned to process D.B. She readvised D.B. of his rights and asked him if he wished to make any statements. D.B. said he understood his rights and that his friend had the gun and D.B. acted as a lookout.
Officer Cowell testified as to the circumstances of D.B.'s arrest. Cowell stated that, when he asked D.B. what he knew about a robbery that had occurred the night before, D.B. stated that his friend who was arrested with him had done it. Cowell stated that he did not recall asking any specific questions in the car on the way to the station, but he stated that D.B. was "babbling." D.B. was very concerned about Cowell checking out the other boy. At the station, D.B. stated that his friend went to rob a woman and D.B. acted as the lookout. Cowell also stated that he notified the violent crimes and the youth divisions that D.B. was in custody after he had his conversation with D.B.
D.B. testified that on February 24, 1997, he and his friend, J.B. (who was the other subject arrested), were walking home. They were joined by another person, E.F. E.F. indicated that he was going to rob a woman across the street. D.B. kept walking away from the woman, and E.F. and J.B. walked toward the woman. D.B. never saw what happened. He denied demanding any money or taking a purse. D.B. stated that, after the police officers had finished searching him and after the detective came and spoke to him, the police had him wait in a room until the youth officer came. He testified that Adamson was a youth officer that met with him, but he stated that she did not inform him of his rights and she did not ask him about the crimes. He also stated that the only reason he told Cowell he was a lookout was because the officer said that a woman had identified him and he had to put something down. The officer stated that if he put him down for the robbery it was going to come down harder on him. D.B. did not feel he had a choice.
In ruling on the February 24 offense, the court stated:
"The complaining witness, in my opinion, was extraordinarily credible. She looked at the young man. She identified him. She identified as to what he did. And his statements to the police corroborate his participation in this robbery. This minor respondent will be found delinquent of robbery."
In the bench trial on the February 17 incident, the complainant testified that she was approached by D.B. and two other men as she exited her parked car. D.B. asked if she had any money for them. She said "no." He came closer and asked if they could have her car. She said "no." She then noticed that her lights were on. She put her key in the lock. D.B. pointed a gun at her stomach and said, "Your keys or your life." She threw the keys a little past his feet. D.B. told her not to move as he reached down and retrieved the keys. She ran off and the three men ran the other direction.
The parties stipulated that the testimony of Officer Cowell would be the same as in the other case.
Detective Bukiri testified that when he spoke with D.B. he advised D.B. of his rights. He questioned D.B. as to the events on February 17, 1997. D.B. stated that he and another person had approached a woman and that the other person pointed a gun at the woman and robbed her. D.B. was the look-out *811 at the time. He named J.B. as the other person.
Officer Gloria Ekerman, a youth officer, testified that on February 25, 1997, she was assigned to process D.B. She read D.B. his rights and asked him what happened on February 17, 1997. D.B. told her that he was a lookout in an incident where some older youths were attempting to take a purse. He said that he did not have a gun, but another individual did.
D.B. testified that on February 17, 1997, he and his friend J.B. were walking home when E.F. approached. E.F. said he was going to rob a woman. D.B. told him that he was on probation, refused to participate, and walked toward home. E.F. and J.B. continued to walk toward the woman. D.B. denied robbing the woman.
When ruling on the February 17 offense, the court stated:
"So do I believe this young man? Not for a second. Do I believe he is guilty of this? Not beyond a reasonable doubt. By all doubt this young man is guilty."
The court found D.B. delinquent of armed robbery.
On August 11, 1997, the court conducted a dispositional hearing. D.B.'s probation officer testified that D.B. needed a very structured setting and that it would be appropriate for him to go to the Department of Corrections. The probation officer indicated, however, that she was concerned because D.B. had been hit by a car several times. He has had multiple injuries to the head and a neurological evaluation had never been performed. She discussed other psychological and emotional problems, apparently referring to a report of a psychological evaluation performed on D.B. on November 6, 1996, which is included in the supplemental record. The officer also stated that she believed that D.B. "needs a lot of structure and needs to be placed in a psychiatric setting, not just in a residential program." She indicated that while his behavior warranted commitment to the Department of Corrections, she did not recommend it because of his other problems.
D.B.'s mother also testified as to various injuries received by D.B. There was no evidence presented as to his prior criminal background, but the record indicates he was on probation at the time of his arrest. At the conclusion of the hearing, the trial court committed D.B. to the Department of Corrections.
D.B. contends his adjudications should be reversed because he received ineffective assistance of counsel. He complains that when counsel moved to suppress the statements he made to the police, counsel failed to support that motion with certain arguments. Specifically, he argues that the statements were not voluntary given his age, IQ, educational level, psychological condition, and the failure of the police to have a youth officer or a parent present during the questioning.
To establish a claim of ineffective assistance of counsel, a defendant must prove that his counsel was deficient and that he was prejudiced by that deficiency. In re A.R., 295 Ill.App.3d 527, 531, 230 Ill.Dec. 391, 693 N.E.2d 869 (1998), citing Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984); People v. Albanese, 104 Ill.2d 504, 525, 85 Ill.Dec. 441, 473 N.E.2d 1246 (1984). To demonstrate prejudice, a defendant must show that there was a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. A.R., 295 Ill.App.3d at 531, 230 Ill.Dec. 391, 693 N.E.2d 869. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." A.R., 295 Ill.App.3d at 531, 230 Ill.Dec. 391, 693 N.E.2d 869. Thus, to prevail on a claim of ineffective assistance of counsel for failing to make certain arguments during a motion to suppress, D.B. must show that there was a reasonable probability that the motion would have been granted if the arguments had been made and that the outcome of the trial would have been different if the statements had been suppressed.
The test for voluntariness is whether, under the totality of the circumstances, the statement was made freely, without compulsion or inducement, with consideration given to the characteristics of the accused and the details of the interrogation. A.R., *812 295 Ill.App.3d at 532, 230 Ill.Dec. 391, 693 N.E.2d 869, citing People v. Thomas, 137 Ill.2d 500, 516, 148 Ill.Dec. 751, 561 N.E.2d 57 (1990). Factors to be considered are the defendant's age, education, intelligence, experience and physical condition; the length and intensity of the interrogation; the existence of any threats, promises, or physical coercion; whether the confession was induced by police deception; and whether the defendant was informed of his constitutional rights. A.R., 295 Ill.App.3d at 533, 230 Ill.Dec. 391, 693 N.E.2d 869, citing People v. Martin, 102 Ill.2d 412, 427, 80 Ill.Dec. 776, 466 N.E.2d 228 (1984); People v. MacFarland, 228 Ill. App.3d 107, 117, 170 Ill.Dec. 35, 592 N.E.2d 471 (1992). In a juvenile case, additional factors come into play, including the time of day and the presence of a parent or interested adult. A.R., 295 Ill.App.3d at 533, 230 Ill.Dec. 391, 693 N.E.2d 869, citing People v. Brown, 235 Ill.App.3d 479, 490, 176 Ill.Dec. 492, 601 N.E.2d 1190 (1992).
Section 5-6(2) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/5-6(2) (West 1996))[1] requires a law enforcement officer who takes a minor into custody to immediately make a reasonable attempt to notify the parent and without unnecessary delay take the minor to the nearest juvenile police officer. The purpose of the notice requirement to the parents is to permit, where possible, a parent to confer with and counsel the juvenile before interrogation and confession. A.R., 295 Ill.App.3d at 533, 230 Ill.Dec. 391, 693 N.E.2d 869, citing People v. Montanez, 273 Ill.App.3d 844, 210 Ill.Dec. 295, 652 N.E.2d 1271 (1995). The relevant inquiry is whether the absence of an interested adult contributed to the coercive circumstances surrounding the interview, not whether contact with a parent was denied. A.R., 295 Ill.App.3d at 533, 230 Ill. Dec. 391, 693 N.E.2d 869, citing People v. Knox, 186 Ill.App.3d 808, 814, 134 Ill.Dec. 564, 542 N.E.2d 910 (1989). Although the presence of a youth officer does not per se make a juvenile's confession voluntary, it is a significant factor, and the failure to have a juvenile officer present is material to determining the voluntariness of a respondent's statement. A.R., 295 Ill.App.3d at 533, 230 Ill.Dec. 391, 693 N.E.2d 869, citing Knox, 186 Ill.App.3d at 815, 134 Ill.Dec. 564, 542 N.E.2d 910.
The transcript of the dispositional hearing indicates that D.B. suffers from problems that could have been valuable to mention in evaluating the voluntary nature of his statements. D.B. was 14 years old at the time of the incidents. The psychological evaluation report written in 1996 indicated that he has an IQ of 73 and suffers from a below normal educational level. D.B. had also been diagnosed with depression and post-traumatic stress.
The record also suggests that the police violated the Juvenile Court Act by failing to immediately contact D.B.'s parents. Bukiri asked D.B. if he wanted his mother called and he said "no." The statute does not condition the requirement of calling a juvenile's parent on whether the juvenile wants his parent called. The Juvenile Act states that the officers shall "immediately make a reasonable attempt to notify the parent." 705 ILCS 405/5-6(2) (West 1996). The record does not indicate when D.B.'s mother was notified, but the arrest occurred near D.B.'s home and yet the officers did not attempt to contact his mother on the way to the station.
The record also indicates that the police contacted youth officers in this case but they arrived after D.B. had been questioned. The police do not appear to have complied with the requirement to take the minor to the nearest juvenile officer "without unnecessary delay." See 705 ILCS 405/5-6(2) (West 1996).
We agree that these issues would have been good arguments to raise during the hearing on the motion. Counsel did not do so and this may have been deficient. Nevertheless, even if counsel's failure to make these arguments is found to satisfy the first prong of the Strickland analysis, D.B. has not established that the alleged deficiencies *813 affected the outcome of the case. We need not definitively answer the question of whether D.B.'s arguments would have affected the outcome of the suppression hearing, because we do not believe the result of D.B.'s trials would have been different had the statements been suppressed. Both complaining witnesses provided solid testimony identifying defendant and his actions. Defendant testified at both trials and admitted that he was present at or near the time of the robberies. The trial court commented on the strength of the complaining witnesses' testimony, and we do not believe that the suppression of D.B.'s statements would have changed the result of his trials. We therefore affirm the adjudications.
D.B. also contends that he is at least entitled to a new dispositional hearing because the trial court committed him to the Department of Corrections without a social investigation report. Section 5-22 of the Juvenile Court Act provides:
"At the dispositional hearing, the court shall determine whether it is in the best interests of the minor and the public that he be made a ward of the court, and, if he is to be made a ward of the court, the court shall determine the proper disposition best serving the interests of the minor and the public. All evidence helpful in determining these questions, including oral and written reports, may be admitted and may be relied upon to the extent of its probative value, even though not competent for the purposes of the adjudicatory hearing. * * * No order of commitment to the Department of Corrections, Juvenile Division, shall be entered against a minor before a written report of social investigation, which has been completed within the previous 60 days, is presented to and considered by the court." (Emphasis added). 705 ILCS 405/5-22(1) (West 1996).
Section 5-21 of the Juvenile Court Act states:
"The written report of social investigation shall include an investigation and report of the minor's physical and mental history and condition, family situation and background, economic status, education, occupation, personal habits, minor's history of delinquency or criminality or other matters which have been brought to the attention of the juvenile court, information about special resources known to the person preparing the report which might be available to assist in the minor's rehabilitation, and any other matters which may be helpful to the court or which the court directs to be included." 705 ILCS 405/5-21 (West 1996).
The record does not contain a written social investigation report prepared within 60 days prior to the disposition order. This is a violation of section 5-22. The State argues that the trial court relied upon a psychological report prepared in November of 1996 as well as testimony from D.B.'s probation officer and his mother to reach its decision and that any error here was harmless.
In In re M.H., 85 Ill.App.3d 385, 386, 40 Ill.Dec. 670, 406 N.E.2d 873 (1980), M.H. was adjudged delinquent in September of 1978. At a dispositional hearing in October 1978, he was placed on probation. In January 1979, he admitted allegations in a petition to revoke his probation. A second dispositional hearing was held in February 1979, at which time the court received and considered a social investigation report pursuant to statute. The court committed M.H. to the Department of Corrections but found that it was in the best interests of the minor and the public that the mittimus be stayed. In September 1979, the minor was again adjudged delinquent and the court committed the minor to the Department of Corrections pursuant to the prior order of commitment. M.H., 85 Ill.App.3d at 386, 40 Ill.Dec. 670, 406 N.E.2d 873.
On appeal, M.H. argued that the trial court erred when it committed him without an updated social investigation. M.H., 85 Ill. App.3d at 386, 40 Ill.Dec. 670, 406 N.E.2d 873. This court agreed that under the Juvenile Court Act no commitment may be ordered without a written social investigation report which has been completed within 60 days. M.H., 85 Ill.App.3d at 388, 40 Ill.Dec. 670, 406 N.E.2d 873. It found the February social investigation report insufficient. The court remanded the case for consideration of a proper disposition after completion of a *814 current written social investigation report. M.H., 85 Ill.App.3d at 389, 40 Ill.Dec. 670, 406 N.E.2d 873. See also In re F.S., 70 Ill.App.3d 526, 26 Ill.Dec. 892, 388 N.E.2d 893 (1979) (trial court erred in committing minor without first having considered the mandatory social investigation report).
Although the court in the instant case had a psychological report from November 1996, this information did not fulfill the statutory mandate. A social investigation report involves more than a psychological evaluation and it must be completed within 60 days. The language of sections 5-21 and 5-22 is intended to insure that a court making a ruling regarding an adjudicated minor has current information regarding the minor, particularly if the court is going to commit the minor to the Department of Corrections.
While D.B.'s attorney did not raise this error to the trial court, the social investigation requirement cannot be waived. In In re Starks, 60 Ill.App.3d 934, 935, 18 Ill.Dec. 301, 377 N.E.2d 590 (1978), the court entered an order committing Starks to the Department of Corrections without an adjudicatory order. Because the trial court failed to issue that order, the court reversed and remanded the case. Starks, 60 Ill.App.3d at 935, 18 Ill.Dec. 301, 377 N.E.2d 590. The court also noted that the Juvenile Court Act (Ill.Rev. Stat.1975, ch. 37, par. 705-1(1)) required the trial court to consider a written social investigation report completed within 60 days prior to a commitment order. While Starks purported to waive consideration of such a report, the court concluded that the legislature did not intend that the juvenile report requirement be waived. "[B]ecause more emphasis is placed upon rehabilitation in a juvenile dispositional proceeding than in criminal sentencing, the judge in the juvenile proceeding is in greater need of social information." Starks, 60 Ill.App.3d at 936-37, 18 Ill.Dec. 301, 377 N.E.2d 590.
In In re R.D., 84 Ill.App.3d 203, 39 Ill.Dec. 707, 405 N.E.2d 460 (1980), R.D. was committed to the Department of Corrections even though nothing entitled a social investigation report was presented to the trial court. The court received a two-page report from the Department of Corrections and a one-page clinical evaluation of the minor prepared by the Department's psychiatrist. These reports informed the court of the minor's prior criminality, his physical and mental condition, and his family situation, including a proposal for family therapy. Although the reports did not specifically document the minor's economic status, education and personal habits, this information was provided to the court through the testimony of witnesses. This court found that the reports submitted in R.D., when viewed in conjunction with the testimony presented at the hearing, provided an adequate basis for the court's decision. This court stated that requiring "a report specified as a social investigation report, when the essential information is presented to the court through testimony and other reports, would be to place form over substance." R.D., 84 Ill.App.3d at 205, 39 Ill. Dec. 707, 405 N.E.2d 460. See also In re K.A.S., 90 Ill.App.3d 211, 213-14, 45 Ill.Dec. 582, 412 N.E.2d 1164 (1980) (social investigation report provided was sufficient).
We hold that the information provided in this case failed to comply with the requirements of section 5-22. The information provided was less comprehensive than what was provided in R.D. and there is nothing in R.D. suggesting that the reports relied upon there were untimely as in this case. A juvenile court must have current social information about a juvenile as provided in the statute before making the important, life-affecting decision to commit a juvenile to the Department of Corrections. We therefore affirm the adjudications, but reverse the dispositional order and remand the case for new proceedings, which must include a recent social investigation report as required by statute.
Affirmed in part and reversed in part: cause remanded.
HOURIHANE, P.J., and THEIS, J., concur.
NOTES
[1] We observe that the Juvenile Court Act was amended after the trial court's proceedings in the case. See Pub. Act. 90-590 § 2001-10, eff. January 1, 1999. The parties do not argue that any of the changes would affect the outcome or analysis in this case.