SECOND DIVISION
MARCH 31, 2006

No. 1-03-1410

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 00 CR 28960 |
| | ) | |
| | ) | The Honorable |
| WALTER B. SLYWKA, | ) | Colleen McSweeney- |
| | ) | Moore, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE GARCIA delivered the opinion of the court.

On December 8, 2000, the defendant, Walter B. Slwyka, was indicted for first degree murder (720 ILCS 5/9-1 (West 2000)). Specifically, that on March 28, 1992, the defendant (1) "intentionally or knowingly shot and killed Jose Roman with a firearm" (See 720 ILCS 5/9-1(a)(1) (West 2000)) (count I), and (2) shot and killed Roman with a firearm "knowing that such shooting with a firearm created a strong probability of death or great bodily harm" (see 720 ILCS 5/9-1(a)(2) (West 2000)) (count II). On March 20, 2003, a jury returned a general verdict finding the defendant guilty of first degree murder. On April 22, 2003, the defendant was sentenced to 25 years in the Illinois Department of Corrections (DOC), on the offense of murder with

the intent to kill or injure (720 ILCS 5/9-1(a)(1) (West 2000)).

The defendant appeals, arguing: (1) he was improperly convicted of first degree murder where one of the two counts alleged intentional murder, because he had been acquitted of attempt murder, based on the same shooting, in an earlier proceeding; (2) his fifth amendment privilege against self-incrimination was violated by the improper admission of statements he had made to a juvenile probation officer (U.S. Const., amend. V); and (3) he was denied his right to a fair trial due to prosecutorial misconduct.

BACKGROUND

I. Prior Juvenile Proceedings

On April 23, 1992, a petition for adjudication of wardship was entered against the defendant, and the defendant was charged in a juvenile petition with, inter alia, attempt murder (Ill. Rev. Stat. 1991, ch. 38, par. 8-4), armed violence (Ill. Rev. Stat. 1991, ch. 38, par. 33A-2), aggravated discharge of a firearm (Ill. Rev. Stat. 1991, ch. 38, par. 24-1.2(a)), and two counts of aggravated battery (Ill. Rev. Stat. 1991, ch. 38, pars. 12-4(a), (b)(1)).  12-4(a), (b)(1).

The juvenile charges stemmed from the shooting of Jose Roman in Chicago, Illinois, on March 28, 1992.  Specifically, the attempt murder charge alleged that the defendant "took a substantial step towards the commission of the crime of murder by

attempting to kill (Jose A. Roman) by shooting [him] in the head with a sawed off shot gun causing serious injury."  The counts of armed violence and aggravated discharge of a firearm were also based on the shooting of Roman.  One aggravated battery count alleged that the defendant "knowingly, without legal justification caused great bodily harm to [Roman] by shooting [him] in the head with a sawed off shotgun causing great bodily injury."  The other aggravated battery count alleged that the defendant "knowingly, without legal justification caused bodily harm to [Roman] by shooting [him] in the head causing serious injury while using a deadly weapon."

In April 1993, the defendant was adjudicated delinquent by the juvenile court of armed violence and aggravated battery. However, the defendant was acquitted of attempt murder.  In May 1993, the defendant was committed to the juvenile department of corrections, and he was paroled in December 1994.

II. Instant Criminal Proceedings

Jose Roman languished in extremis for eight years, until he died on October 24, 2000.  On December 8, 2000, the State charged the defendant, and codefendant Samuel Rios, with two counts of first degree murder based on the 1992 shooting of Roman.

Prior to trial, defense counsel filed a motion to dismiss the criminal indictment based on collateral estoppel.  Defense counsel argued that the defendant's earlier acquittal of attempt murder barred a subsequent prosecution for murder based on the

same facts.  The trial court rejected the argument and denied the defendant's motion to dismiss.

At trial, the following facts were adduced.  On March 28, 1992, at approximately 5 p.m., the defendant, who was 15 years old, and his friend, Samuel Rios, were driving around the area of Cicero and Parker, in Chicago, Illinois, in a stolen gold, four-door Oldsmobile Cutlass Supreme (Oldsmobile).  The defendant and Rios were part of a street gang called the Spanish Cobras, and they were looking for a member of the Latin Kings street gang in order to retaliate for a shooting that had targeted the Spanish Cobras a few days earlier.  Initially, the defendant was driving the Oldsmobile and Rios was in the front-passenger seat; however, at some point the two switched places.  A shotgun was under the front seat.  The defendant and Rios saw the victim, Roman, and believed he was a Latin King.  The defendant flashed Roman a Latin King's hand signal, and Roman flashed a signal back.  Believing that Roman returned the hand signal because he was a member of the Latin Kings, the defendant grabbed the shotgun and fired one shot at Roman's head.

Rick Hernandez, a car salesman working at a car lot on the west side of Cicero and Parker, testified that at around 5 p.m. on March 28, 1992, he heard what he believed to be a car backfire.  Hernandez looked across the street and saw a man, Roman, fall to the ground.  Hernandez also saw a gold Oldsmobile with two males wearing black hoodies speed away from the scene.

4

Hernandez described the driver as a "darker-skinned Hispanic guy," and the passenger as a "little bit lighter Hispanic." Although Hernandez did not get the Oldsmobile's license plate, he noted that the car had unusual rally wheels.

One of Hernandez's employees called the police, and Hernandez ran across the street to the victim. Chicago police detective Mark Flynn and Chicago police officer Leon Putyrski were patrolling in the area and were the first to arrive at the scene. Detective Flynn saw Roman lying on the sidewalk and noted a gunshot wound to the back of Roman's head. Detective Flynn contacted Chicago firefighters Robert Cordt and Rich Vale, who arrived at approximately 5:10 p.m. Firefighter Cordt found that Roman had suffered a gunshot wound to the back of the head, was unresponsive, without a pulse, and was not breathing. Roman was stabilized and transported to Advocate Illinois Masonic Medical Center where he remained for four months before being transferred to a long-term care facility.

Chicago police lieutenant Anthony Riccio was assigned to conduct the investigation. On March 30, 1992, Lieutenant Riccio reviewed the police reports and began searching for the Oldsmobile that had been seen fleeing the scene. Later that same day, Lieutenant Riccio located the Oldsmobile and discovered that it had been reported stolen 7 to 10 days earlier. Lieutenant Riccio contacted Hernandez, who positively identified the Oldsmobile as the car involved in the shooting.

Lieutenant Riccio also had the names of two possible suspects, the defendant and Rios. On April 22, 1992, Lieutenant Riccio went to the home of the defendant and the home of Rios and transported both of them to the Area 5 police station. At approximately 2 p.m., after the defendant had been read his rights, Lieutenant Riccio had a conversation with him in the presence of Youth Officer Joanne Hammermeister. The defendant incriminated himself and admitted to shooting Roman in the back of the head.

At approximately 6 p.m., Assistant State's Attorney (ASA) Thomas Torcasso advised the defendant of his rights. The defendant indicated he wanted to make a statement. ASA Torcasso took the defendant's statement in the presence of Youth Officer Hammermeister. In the statement, the defendant again admitted to shooting Roman in retaliation for an earlier gang shooting. ASA Torcasso allowed the defendant to review and correct the statement. ASA Torcasso, Youth Officer Hammermeister, Lieutenant Riccio, and the defendant each signed every page of the statement.

The defendant's statement, which was published to the jury, begins with his acknowledgment that he understood that he had the right to talk to a lawyer and have an attorney present during questioning. The defendant also acknowledged that he understood that if he could not afford a lawyer, one would be appointed by the trial court. The defendant then reaffirmed that he wished to

give a statement. The defendant's statement contained the following information. On March 28, 1992, he was a member of the Spanish Cobra street gang, and at around 2:30 p.m. on that day, he met Rios and others to discuss shooting a Latin King or Latin Brother in retaliation for a shooting in which the Spanish Cobras were targeted. Rios was going to do the shooting and the defendant was going to drive; Rios had a sawed-off shotgun which he placed in a book bag. Rios led the defendant to a brown four-door Cutlass Oldsmobile. The defendant began driving, with Rios in the passenger seat and the gun on the floor. A short time later, the defendant and Rios switched places because Rios did not think he could handle the kick from the gun. After driving around for a while, the defendant and Rios drove up to the intersection of Parker and Cicero, where a man had just stepped off the sidewalk to cross the street in front of their car. The defendant flashed the Latin King sign to see if the man would return the gesture; when he did, the defendant raised the shotgun and fired one shot. The defendant aimed for the man's back, but did not know where he shot the man. The defendant and Rios then sped away from the scene.

The State also called juvenile probation officer Mary Patoff. Officer Patoff had conducted an interview in 1993 with the defendant for a court-ordered presentence social investigation report to be used in the defendant's dispositional hearing. Officer Patoff testified that she questioned the

defendant alone in order to get his version of events. Officer Patoff testified that she was also receptive to hearing anything else the defendant might want to tell her. Officer Patoff testified that the defendant told her he was "in full agreement" with the "findings from Juvenile Court," or the "findings and charges that were brought into Juvenile Court." Officer Patoff also recounted what the defendant told her regarding the day of Roman's shooting. On cross-examination, Officer Patoff testified that the defendant told her that he regretted what he had done; Officer Patoff also testified that the defendant said he was sorry and showed remorse. Officer Patoff testified that the defendant knew Roman was in a nursing home, and, he told Officer Patoff that he wanted to apologize to the victim and the victim's family, as the defendant realized that his actions had ruined both their lives. Officer Patoff also testified:

> "He stated that he wished he could change the situation, that it was very difficult for him to face. He also felt that he ruined his life, he told [me] that he realized he would be held accountable for his actions."

Rios testified and substantially corroborated the statements attributed to the defendant. Rios testified that his testimony was not part of any agreement or deal. On cross-examination, Rios testified that he and the defendant had been to juvenile court and were convicted; however, the State objected to the jury

learning that the defendant had been acquitted of attempt murder in the juvenile proceeding.

Cathy Roman, the victim's sister, testified that she saw her brother on the morning of the shooting and did not see him again until he was in the hospital's intensive-care unit. Cathy Roman also told jurors that her brother never regained consciousness after the shooting and was housed in a nursing home for 8 ½ years until his death.

Dr. Michael Grendon, the victim's treating physician from August 10, 1992, until his death, testified that Roman was in a chronic vegetative state from the time he was admitted to the nursing home until his death. Dr. Grendon also described Roman on good and bad days.

At the close of evidence and arguments, the jury was given instructions corresponding to the two counts of the indictment (Illinois Pattern Jury Instructions, Criminal, Nos. 7.01, 7.02 (4th. ed. 2000)), and returned a general verdict finding the defendant guilty of first degree murder. On April 21, 2003, the trial court sentenced the defendant to 25 years in DOC, with credit for time served as a juvenile. The trial court's sentencing order reflects that the sentence was entered on the intentional murder count of the indictment. This appeal followed.

ANALYSIS

I. Collateral Estoppel

The first issue we must consider on appeal is whether the State was collaterally estopped from charging the defendant with two counts of first degree murder: intentional murder (720 ILCS 5/9-1(a)(1) (West 2000)), and strong probability murder (720 ILCS 5/9-1(a)(2) (West 2000)).

## A. Standard of Review

The parties disagree as to the correct standard of review. The defendant asserts that the issue before us is one of law and should be reviewed <u>de</u> <u>novo</u>.  Conversely, the State urges that the defendant "challenges his conviction based upon the sufficiency of the evidence" and the relevant standard is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Contrary to the State's assertion, the defendant is not challenging his conviction based on the sufficiency of the evidence.  Instead, the defendant asserts that the State was foreclosed from charging him with first degree murder as he was previously acquitted of attempt murder in the juvenile proceedings.  As this presents a question of law, our review is <u>de</u> <u>novo</u>.  <u>People v. Mitchell</u>, 353 Ill. App. 3d 838, 844, 819 N.E.2d 1252 (2004) (the appellate court reviews pure questions of law under a <u>de</u> <u>novo</u> standard of review).

## B. Motion to Dismiss

Collateral estoppel is a component of double jeopardy.

10

People v. Carrillo, 164 Ill. 2d 144, 151, 646 N.E.2d 582 (1995). The doctrine of collateral estoppel provides that when a valid, final judgment determines an issue of ultimate fact, the same parties cannot litigate the issue in any future lawsuit. People v. Jones, 301 Ill. App. 3d 608, 609-10, 703 N.E.2d 994 (1998). Collateral estoppel applies when (1) the issue decided in the prior adjudication is identical to the one presented in the instant suit, (2) there was a judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party, or in privity with a party, to the prior adjudication. People v. Krstic, 292 Ill. App. 3d 720, 723, 686 N.E.2d 692 (1997), citing Talarico v. Dunlap, 177 Ill. 2d 185, 191, 685 N.E.2d 325 (1997).

Sections 9-1(a)(1) and (a)(2) present multiple theories that constitute the single offense of murder, and each of these theories has its own mental state. People v. Stalions, 139 Ill. App. 3d 1033, 1036, 488 N.E.2d 297 (1986). In this case, following the death of Roman, the State charged the defendant with two counts of murder. Count I alleged murder as defined in section 9-1(a)(1), specifically that on March 28, 1992, the defendant "intentionally or knowingly shot and killed Jose Roman with a firearm." See 720 ILCS 5/9-1(a)(1) (West 2000). Section 9-1(a)(1) is known as "intentional murder." See People v. Davis, 213 Ill. 2d 459, 471, 821 N.E.2d 1154 (2004). Count II of the indictment alleged murder based on section 9-1(a)(2),

11

specifically that the defendant shot and killed Roman with a firearm, "knowing that such shooting with a firearm created a strong probability of death or great bodily harm" to Roman. 720 ILCS 5/9-1(a)(2) (West 2000). Section 9-1(a)(2) is known as "strong probability murder." People v. Villarreal, 198 Ill. 2d 209, 213, 761 N.E.2d 1175 (2001). The drafters of section 9-1 explained that "[s]ubsection (a)(1) is intended to define the two most culpable types of conduct," while "[s]ubsection (a)(2) is intended to define the conduct which, lacking actual intent to kill or do great bodily harm or knowledge that such a result will occur, involves knowledge of the probability that the offender's acts will cause death or great bodily harm." 720 ILCS Ann. 5/9-1, Committee Comments-1961, at 16-17 (Smith-Hurd 2002); Stalions, 139 Ill. App. 3d at 1036. Moreover, the intent to do great bodily harm that results in death does not refer to the same mental state as that of the intent to kill. Stalions, 139 Ill. App. 3d at 1036.

Prior to the defendant's trial, defense counsel filed a motion to dismiss both counts of murder on the basis of collateral estoppel. Defense counsel argued that the defendant's acquittal of attempt murder in his juvenile proceeding barred the State's murder prosecution. Defense counsel relied on Carrillo, 164 Ill. 2d 144, 646 N.E.2d 582, and particularly the facts surrounding the defendant Dolly Stacey.

In Carrillo, Dolly Stacey solicited Eduardo Carrillo to

12

break into the basement apartment of her tenant, Helen Serafin, in order to frighten Serafin into vacating the premises. Carrillo, 164 Ill. 2d at 147. Carrillo and several associates broke into Serafin's apartment and proceeded to rob and shoot her. Carrillo, 164 Ill. 2d at 147. Serafin was paralyzed, languished for nine years, and ultimately died. Carrillo, 164 Ill. 2d at 146. Shortly after the break-in and shooting, Stacey and Carrillo were charged with attempt murder, home invasion, armed robbery, burglary, aggravated battery, and armed violence. Carrillo, 164 Ill. 2d at 147. Stacey was convicted of home invasion and burglary on an accountability theory; however, she was acquitted of attempt murder, armed robbery, aggravated battery, and armed violence. Carrillo, 164 Ill. 2d at 147. Carrillo pled guilty to all charges. Carrillo, 164 Ill. 2d at 147.

Upon Serafin's death, the State charged Carrillo and Stacey with: (1) intentionally and knowingly shooting and killing Serafin, (2) knowing that such a shooting created a strong probability of death or great bodily harm, and (3) felony murder based on home invasion, burglary, and armed robbery. Carrillo, 164 Ill. 2d at 146. The defendants moved to dismiss the indictments based on double jeopardy. The trial court denied the defendants' motions; however, the appellate court considered the principles of double jeopardy and collateral estoppel and reversed the trial court, barring all indictments except for that

13

of murder based upon a strong probability of death or great bodily harm.  <u>Carrillo</u>, 164 Ill. 2d at 146.

For our purpose, it is only necessary to recount our supreme court's findings as to Stacey's claims based on collateral estoppel.  Our supreme court found that collateral estoppel barred Stacey's prosecution for murder based upon the intent to kill or cause great bodily harm, as well as felony murder based upon armed robbery, because she had been acquitted of attempt murder, aggravated battery, and armed robbery.  Based on the three acquittals, it was established that reasonable doubt existed as to the intent to kill (attempt murder), intent to cause great bodily harm (aggravated battery), and armed robbery (felony murder).  <u>Carrillo</u>, 164 Ill. 2d at 152.  "Consequently, we conclude that the murder charges based upon intent to kill or do great bodily harm are foreclosed as against Stacey based upon principles of collateral estoppel."  <u>Carrillo</u>, 164 Ill. 2d at 152.

Our supreme court did not find that the State was collaterally estopped from charging Stacey with first degree murder that alleged a mental state other than the mental states present in attempt murder or aggravated battery.  Specifically, our supreme court held:

> "As regards Stacey, we hold that she may be charged with *** murder based upon *** the knowledge that her actions created a

14

> strong possibility of death or great bodily
> harm.  We further find, however, that she may
> not be charged with *** murder based upon ***
>  the intent to kill or cause great bodily
> harm."  Carrillo, 164 Ill. 2d at 152.

The State seeks to distinguish Carrillo by contending that the defendant in this case was found guilty of aggravated battery.  The State correctly concedes that the defendant's "acquittal for attempt murder was tantamount to a determination that there was reasonable doubt that defendant had the requisite intent to kill the victim and, therefore, foreclosed the possibility of subsequently prosecuting defendant for intentional murder."  The State asserts, however, that the defendant's argument would require this court to ignore the principles of statutory construction.  The State contends that the defendant's argument is "fatally flawed" because it disregards the plain and ordinary meaning of the first degree murder statute, which states that a defendant commits first degree murder pursuant to section 9-1(a)(1) where "he **either** intends to kill **or** [intends to] do great bodily harm to that individual."  (Emphasis in original.) 720 ILCS 5/9-1(a)(1) (West 2000).  The State goes on:

> "[T]he People have no quarrel with the legal
> premise that a defendant's earlier acquittals
> for attempt murder foreclose any possibility
> that the defendant could be prosecuted under

> a theory of intentional murder based on the
> 'intent to kill.' *** Here, defendant was
> acquitted of attempt murder yet, found guilty
> of aggravated battery. Therefore, the People
> *** maintain that an acquittal for attempt
> murder does not foreclose the possibility
> that defendant can be prosecuted under a
> theory of intentional murder based on 'intent
> to do great bodily harm' where defendant was
> previously convicted of aggravated battery
> arising out of the same conduct."

The State's argument is a convincing one, but inapplicable to the defendant at bar because the State did not charge the defendant with intentional murder based on an "intent to do great bodily harm." Instead, count I of the State's indictment charges that the defendant "without lawful justification, intentionally or knowingly shot and killed Jose Roman with a firearm." See 720 ILCS 5/9-(a)(1) (West 2000). Count I included as an element the specific intent to kill with which he was charged in committing the attempt murder in the juvenile proceeding. "The offense of attempt murder requires the mental state of specific intent to commit murder, to kill someone." People v. Jones, 81 Ill. 2d 1, 8, 405 N.E.2d 343 (1979). Section 8-4 clearly sets out, "A person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step

16

toward the commission of that offense." 720 ILCS 5/8-4(a) (West 2000). As the defendant was acquitted of attempt murder, the intent element required for attempt murder cannot support the first count of the State's indictment charging the defendant with "intentional murder." As such, the first degree murder charge based on an "intent to kill" is foreclosed by Carrillo.

As in Carrillo, the State in this case was not barred from charging the defendant with first degree murder based on the defendant's shooting of the victim as stated in the indictment, "knowing that such shooting with a firearm created a strong probability of death or great bodily harm." See Carrillo, 164 Ill. 2d at 152; 720 ILCS 5/9-1(a)(2) (West 2000). However, because the defendant was acquitted of attempt murder, there was no basis for the intentional murder count of the State's indictment. As such, the State erred in so charging the defendant. In denying the defendant's motion to dismiss the murder charges, the trial court distinguished Carrillo from the facts of the instant case and stated, "[a]ttempt murder is a specific intent crime, first degree murder is not." The trial court's statement was only half right. First degree murder is generally not a specific intent crime, except when intent is an element of the offense. As Carrillo precluded the State from prosecuting the defendant on the intentional murder charge, the trial court erred in refusing to dismiss the first count of the State's indictment.

17

1-03-1410

## C. "One Good Count" Rule

Although we have determined that the State's charge relating to "strong probability murder" was not collaterally barred by the defendant's acquittal of attempt murder, we must address whether the trial error in instructing the jury on intentional murder tainted the jury's general verdict of guilt. The defendant argues that because the State presented a theory of intentional murder, and the jury was given an instruction regarding that count of the defendant's indictment, there is no way to discern whether the jury based its general finding of guilt on the defective intentional murder count of the indictment or on the count of strong probability murder.

While acknowledging the "one good count" rule established in People v. Lymore, 25 Ill. 2d 305, 185 N.E.2d 158 (1962), may be a basis to affirm a general finding of guilt where proof is sufficient on the good count in an indictment, the defendant contends that "the 'one good count' rule [does not apply] to cases where a general verdict of guilt was tainted by a legally deficient count." (Emphasis in original.) As support for his position, the defendant quotes a passage from our supreme court in People v. Griffin, 178 Ill. 2d 65, 83, 687 N.E.2d 820 (1997), quoting People v. Griffin, 247 Ill. App. 3d 1, 16 (1993): "'After [Griffin v. United States, 502 U.S. 46, 116 L. Ed. 2d 371, 112 S. Ct. 466 (1991)], then, a general guilty verdict based on an instruction which includes different methods of committing

18

the same offense in the disjunctive is ground for reversal only where one alternative is legally defective ***.'"

Although there is no disputing that statement of law, its application to this case is the issue. In reference to a "legally defective" alternative to committing the same offense, our supreme court in Griffin limited the application of "legally defective" to where the alternative method "'fails to correctly state the law, and not where the flawed alternative is factually inadequate, i.e., where the evidence is insufficient to sustain that count.'" Griffin, 178 Ill. 2d at 83-84, quoting People v. Griffin, 247 Ill. App. 3d 1, 16, 616 N.E.2d 1242 (1993). No error that the jury was misinstructed as to the law on intentional murder has been urged here; nor did such an error occur. The intentional murder instruction was a proper statement of Illinois law; it was simply foreclosed by the previous finding of not guilty of attempt murder. Moreover, the previous finding of not guilty of attempt murder was an evidentiary-based finding in the juvenile proceeding that reasonable doubt existed as to the defendant's intent to kill; that is, the evidence was insufficient to sustain that charge. The error in instructing the jury on intentional murder in this case was not based on a legally defective alternative method of committing first degree murder, but rather on a factually inadequate alternative. Accordingly, contrary to the defendant's assertion, this is not a case "where a general verdict of guilt was tainted by a legally

19

deficient count."  As such, we find the defendant's conviction based on the charge of strong probability murder must be upheld because the jury's general verdict supports count II of the indictment as the evidence presented in the case was more than sufficient to support the jury's finding of guilt.  Where a general verdict is "returned, the effect is that the defendant is guilty as charged in each count to which the proof is applicable."  People v. Cardona, 158 Ill. 2d 403, 411, 634 N.E.2d 720 (1994).

In light of the different mental states involved in intentional murder and strong probability murder, a remand is in order to allow the trial court to determine whether a lesser sentence should be imposed on count II of the indictment.  See Cardona, 158 Ill. 2d at 412, 634 N.E.2d 720 (1994) ("A killing that occurs when acts are performed with the intent to kill or to do great bodily harm involves a more culpable mental state than does either a killing that occurs when acts are performed with the knowledge that they create a strong probability of death or great bodily harm or a killing that occurs in the course of a felony.  [Citation].  Where charges of intentional, knowing, and felony murder have been proved, intentional murder is deemed to be the most serious offense").

## II. Fifth Amendment

The defendant next contends that his fifth amendment right against self-incrimination was violated because Officer Patoff's

testimony was admitted at trial as evidence that he murdered Roman.  As previously stated, Officer Patoff interviewed the defendant when he was a juvenile, after he was found delinquent, and in anticipation of his dispositional hearing.  The defendant specifically maintains that his fifth amendment privilege against self-incrimination was violated because he was not warned of his right to remain silent before his interview with Officer Patoff.  The defendant concedes that he has forfeited this argument as he failed to raise it during trial.  However, the defendant emphasizes that he raised this issue in his posttrial motion and urges us to consider the merits of his argument.  We elect to do so.

The fifth amendment, made applicable to the states through the fourteenth amendment, commands that "[n]o person *** shall be compelled in any criminal case to be a witness against himself."  U.S. Const., amends. V, XIV.  In support of his position, the defendant analogizes the facts of this case to those in Estelle v. Smith, 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866

21

(1981).[1]

In <u>Estelle</u>, a death sentence was overturned because a defendant's inculpatory statements, made during a court-ordered psychiatric inquiry to determine the defendant's fitness to stand trial, were also subsequently used during sentencing to establish

---

[1]We note that although <u>Estelle</u> dealt with the defendant's fifth amendment privilege against self-incrimination, the <u>Estelle</u> Court also discussed the defendant's sixth amendment right to counsel and found that that right had also been abridged. As no such claim is made by the defendant in this case, we need not discuss it.

the defendant's future dangerousness.  Estelle, 451 U.S. at 469 68 L.Ed 2d at 373, 101 S. Ct. at 1876.  The defendant in Estelle was indicted for murder arising from his participation in the armed robbery of a grocery store during which the clerk was fatally shot by the defendant's accomplice.  The State of Texas announced that it would seek the death penalty; thereafter, the trial judge, as was his common practice in death penalty cases, ordered the defendant to undergo a psychiatric evaluation to determine the defendant's competency to stand trial.  Dr. James P. Grigson interviewed the defendant in jail for approximately 90 minutes and concluded that he was competent.  The defendant was subsequently found guilty.  Estelle, 451 U.S. at 456-57, 68 L. Ed. 2d at 365, 101 S. Ct. at 1870.

In Texas, capital cases are bifurcated into guilt and penalty phases.  At the penalty phase, if the jury affirmatively answers three questions on which the State has the burden of proof beyond a reasonable doubt, the judge must impose the death penalty.  One of the critical questions for the jury is: "'whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.'"  Estelle, 451 U.S. at 457-58, 68 L. Ed. 2d at 366, 101, S. Ct. at 1870, quoting Tex. Code Crim. Proc. Ann' art. 37.071(b)(2) (Vernon Supp. 1980).

At the commencement of the penalty phase of the defendant's

23

trial, defense counsel called three lay witnesses and the State called only Dr. Grigson.  Before trial, defense counsel had obtained an order requiring the State to disclose the witnesses it planned to use at both the guilt and penalty stages of the defendant's trial.  As Dr. Grigson's name was not on the witness list, defense counsel objected to his being called and made a motion to bar his testimony.  The trial court denied the defendant's motion.  Dr. Grigson then testified that the defendant (1) "'is a very severe sociopath'"; (2) "'will continue his previous behavior'"; (3) has a sociopathic condition which will "'only get worse'"; (4) has no "'regard for another human being's property or for their life, regardless of who it may be'"; (5) that there is "'no treatment, no medicine ... that in any way at all modifies or changes this behavior'"; (6) that he "'is going to go ahead and commit other similar *** criminal acts if given the opportunity to do so'"; and (7) that he "'has no remorse or sorrow for what he has done.'"  Estelle, 451 U.S. at 459-60, 68 L. Ed. 2d at 367, 101 S. Ct. at 1871.  Dr. Grigson's testimony was based on the examination the trial court ordered to determine the defendant's fitness to stand trial.  Following the presentation of evidence, the jury answered the three questions in the affirmative and the trial court sentenced the defendant to death.  Estelle, 451 U.S. at 460, 68 L. Ed. 2d at 367, 101 S. Ct. at 1871.

The U.S. Supreme Court first considered whether the

admission of Dr. Grigson's testimony at the penalty phase of the defendant's trial violated the defendant's fifth amendment privilege against compelled self-incrimination because the defendant was not advised before the pretrial psychiatric examination that he had a right to remain silent and that any statement he made could be used against him at a sentencing proceeding. Estelle, 451 U.S. , at 461, 68 L. Ed. 2d at 368, 101 S. Ct. at 1872.

The Supreme Court began its analysis by determining that there was no basis to distinguish between the guilt and penalty phases of the defendant's capital murder trial; "the State is not relieved of the obligation to observe fundamental constitutional guarantees." Estelle, 451 U.S. at 463, 68 L. Ed. 2d at 369, 101 S. Ct. at 1873. The Court continued, "[a]ny effort by the State to compel [the defendant] to testify against his will at the sentencing hearing clearly would contravene the Fifth Amendment. Yet the State's attempt to establish respondent's future dangerousness by relying on the unwarned statements he made to Dr. Grigson similarly infringes on Fifth Amendment values." Estelle, 451 U.S. at 463, 68 L. Ed. 2d at 369, 101 S. Ct. at 1873. The Estelle Court then recounted that the trial court had, on its own motion, ordered a psychiatric examination "for the limited, neutral purpose of determining [the defendant's] competency to stand trial," but the results of the examination were used for a much broader objective. "Consequently, the

interview with Dr. Grigson cannot be characterized as a routine competency examination \*\*\* if the application of Dr. Grigson's findings had been confined to serving that function, no Fifth Amendment issue would have arisen."  Estelle, 451 U.S. at 465, 68 L. Ed. 2d at 369, 101 S. Ct. at 1874.

The Estelle Court also noted that the defendant's future dangerousness was a critical issue at sentencing, and it had to be proven by the State beyond a reasonable doubt.  The Estelle court commented that to meet its burden, the State presented only one witness whose testimony was based on the defendant's own statements, "unwittingly made without an awareness that he was assisting the State's efforts to obtain the death penalty." Estelle, 451 U.S. at 466, 68 L. Ed. 2d at 371, 101 S. Ct. at 1875.

The Supreme Court also discussed that because Dr. Grigson's examination of the defendant took place while the defendant was in custody, the defendant should have been given Miranda warnings.  Estelle, 451 U.S. at 466-67, 68 L. Ed. 2d at 371 S. Ct. at 1875.  "That respondent was questioned by a psychiatrist \*\*\* is immaterial.  When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of [the defendant's] future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting."

<u>Estelle</u>, 451 U.S. at 467, 68 L. Ed. 2d at 372, 101 S. Ct. at 1875.

The Supreme Court concluded its fifth amendment analysis by noting that although volunteered statements are not barred by the fifth amendment, under <u>Miranda</u> the defendant's statements to Dr. Grigson were not given freely or voluntarily without any compelling influences and, as such, could not be used unless the defendant had been apprised of his rights and had knowingly decided to waive them.  <u>Estelle</u>, 451 U.S. at 469, 68 L. Ed. 2d at 373, 101 S. Ct. at 1876.

The Illinois Appellate Court has previously addressed similar fifth amendment arguments in separate cases.  In each case, the defendant argued that his privilege against self-incrimination was violated when statements made at presentencing interviews were introduced at the defendant's sentencing hearing.  In <u>People v. Bachman</u>, 127 Ill. App. 3d 179, 184-85, 468 N.E.2d 817 (1984), the Second District concluded that <u>Miranda</u> warnings were not required in connection with the defendant's submission to a routine and court authorized presentence interview.  A similar finding was reached in <u>People v. Corrigan</u>, 129 Ill. App. 3d 787, 795, 473 N.E.2d 140 (1985), where the Fourth District found that "<u>Miranda</u> warnings are not required when a defendant is interviewed in connection with a routine presentence report."

We distinguish the facts of the case <u>sub</u> <u>judice</u> from <u>Bachman</u> and <u>Corrigan</u> because each defendant in those cases made the

27

incriminating statements during routine presentence interviews in anticipation of sentencing in noncapital cases. We find the facts of this case to be more similar to Estelle. Here, the defendant's statements to Officer Patoff were made in anticipation of Officer Patoff's preparation of a routine social investigation report for the juvenile court, which is as far as the holdings in Bachman and Corrigan reach; however, the defendant's statements were then used at his trial for Roman's murder where the State must observe "fundamental constitutional guarantees" which bar "[a]ny effort by the State to compel [the defendant] to testify against his will." Estelle, 451 U.S. at 463, 68 L. Ed. 2d at 369, 101, S. Ct. at 1873.

The defendant's statements, here, were taken by Officer Patoff for the equivalent of a presentence investigation report. As the U.S. Supreme Court similarly noted in Estelle, if Officer Patoff's report had been confined to serving that function, no fifth amendment issue would have arisen. Estelle, 451 U.S. at 465, 68 L. Ed. 2d at 370, 101 S. Ct. at 1874; A social investigation report is mandated in the State of Illinois and cannot be waived. In re D.B., 303 Ill. App. 3d 412, 422, 708 N.E.2d 806 (1999). A social investigation report is a useful tool to the juvenile court because a juvenile court must have current social information about a juvenile as provided in the statute before making the important life-affecting decision to commit a juvenile to the Department of Corrections. D.B., 303

28

Ill. App. 3d at 422.  However, the defendant's statements were used for more than a disposition recommendation, without the defendant being made aware of that possibility.  The fifth amendment privilege, therefore, is directly involved here because the State used as evidence against the defendant the substance of his disclosures to Officer Patoff during the social investigation interview.  Estelle, 451 U.S. at 465, 68 L. Ed. 2d at 370, 101 S. Ct. at 1874.

Because the safeguards of the fifth amendment privilege were not afforded the defendant, we find that the trial court erred in permitting the State to introduce Officer Patoff's testimony at the defendant's murder trial.  The State urges that if we find a fifth amendment violation, the admission of Officer Patoff's testimony amounts to harmless error in light of the overwhelming evidence against the defendant.

### III. Harmless Error Beyond A Reasonable Doubt

A constitutional error does not automatically require reversal of a conviction.  People v. Patterson, 217 Ill. 2d 407, 423, 841 N.E.2d 889 (2005), citing Arizona v. Fulminante, 499 U.S. 279, 306, 113 L. Ed. 2d 302, 329, 111 S. Ct. 1246, 1263 (1991).  The United States Supreme Court has applied harmless-error analysis to a wide range of errors and has recognized that most constitutional errors are trial errors, that is, "'error[s] which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context

of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.'" Patterson, 217 Ill. 2d at 424, quoting Fulminante, 499 U.S. at 307-08, 113 L. Ed. 2d at 330, 111 S. Ct. at 1264. We find that the constitutional error in this case was a "trial error" and that the error is subject to a harmless-error analysis. The issue, therefore, is whether the fifth amendment violation in the case at bar was harmless beyond a reasonable doubt.

In determining whether a constitutional error is harmless, the test to be applied is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained. People v. Patterson, 217 Ill. 2d 407, 428, 841 N.E.2d 889 (2005).

> "[T]his court [has] listed three different
> approaches for measuring error under this
> harmless-constitutional-error test: (1)
> focusing on the error to determine whether it
> might have contributed to the conviction, (2)
> examining the other evidence in the case to
> see if overwhelming evidence supports the
> conviction, and (3) determining whether the
> improperly admitted evidence is merely
> cumulative or duplicates properly admitted
> evidence." Patterson, 217 Ill. 2d at 428;
> citing People v. Wilkerson, 87 Ill. 2d 151,

157, 429 N.E.2d 526 (1981).

In applying these approaches to the case at bar to determine whether the admission of Officer Patoff's testimony was harmless beyond a reasonable doubt, we find that Officer Patoff's testimony did not contribute to the defendant's conviction because it was cumulative and duplicated other evidence properly admitted at the defendant's murder trial and there was overwhelming evidence to support the defendant's conviction.  In his reply brief, the defendant argues that "[Officer] Patoff's testimony amounted to nothing more tha[n] an unwarned confession attributed to [the defendant], and a 'confession is the most powerful piece of evidence the State can offer, and its effect on the jury is incalculable.'  [Citation]"  We agree that a confession is powerful evidence when placed before the jury, but the defendant had given two statements implicating himself in the shooting of Roman prior to speaking with Officer Patoff and evidence of these other "confessions" was presented to the jury.

The defendant first gave a statement to Lieutenant Riccio. At the defendant's murder trial, Lieutenant Riccio testified that after being given <u>Miranda</u> warnings the defendant incriminated himself and admitted to shooting Roman in the back of the head. Later, the defendant provided ASA Torcasso with a written statement.  ASA Torcasso testified that he assisted the defendant in making a written statement in which the defendant admitted shooting Roman in retaliation for an earlier gang shooting.  ASA

31

1-03-1410

Torcasso added that the defendant's statement was signed by the defendant, ASA Torcasso, Youth Officer Hammermeister, and Lieutenant Riccio. Moreover, besides the defendant's statements to Lieutenant Riccio and ASA Torcasso, the State introduced other overwhelming evidence, including the testimony of codefendant Rios, that led to the defendant's conviction. Accordingly, we find that under the "harmless-constitutional-error test" set out in Patterson, the erroneous admission of Officer Patoff's testimony to be harmless beyond a reasonable doubt. Patterson, 217 Ill. 2d at 428, 841 N.E.2d 889.

### IV. Prosecutorial Misconduct

The defendant's final contention is that he was denied a fair trial because the State played to the jury's emotions by presenting irrelevant information about the victim and his family. The defendant maintains that the State's opening statement and closing arguments, as well as the testimony of Hernandez, Officer Flynn, Cathy Roman, and Dr. Grendon, were prejudicial.

The defendant acknowledges that these claims were not preserved for appeal because there was neither a trial objection nor a written posttrial motion as to each. People v. Enoch, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988) (both an objection at trial and a written posttrial motion are required to preserve an issue for appeal). Therefore, the alleged errors are only reviewable under the plain error exception to the forfeiture

32

rule. It is well established that plain error will be invoked in criminal cases only where the evidence is closely balanced or the error is of such magnitude that the accused was denied a fair trial. People v. Williams, 192 Ill. 2d 548, 570, 736 N.E.2d 1001 (2000). As we have determined that the evidence is not closely balanced, the defendant must meet the second prong under plain error review that he was denied a fair trial because of the magnitude of the claimed errors. "A reviewing court will grant relief under the second prong of the plain error rule only if the error is so fundamental to the integrity of the judicial process that the trial court could not cure the error by sustaining an objection or instructing the jury to disregard the error." People v. Vargas, 174 Ill. 2d 355, 363-64, 673 N.E.2d 1037 (1996). In a plain error analysis, it is the defendant that bears the burden of persuasion as to prejudice. People v. Thurow, 203 Ill. 2d 352, 363, 786 N.E.2d 1019 (2003).

Specifically, the defendant contends that "[t]he prosecutor presented irrelevant argument and testimony about the decedent and his family, including the fact that the decedent had tears coming down his eyes when he was discovered lying on the street immediately after the shooting; that the decedent left behind a pregnant girlfriend and two children; and that the decedent wore a diaper because he could not go to the bathroom on his own." To support his claim that the prosecutor's conduct denied him a fair trial, the defendant concludes: "The sole purpose of these antics

33

was to inflame and arouse the passions and emotions of the jurors by evoking sympathy for the decedent and his family.  It is impossible to determine to what extent these tactics succeeded in improperly influencing the jury's finding of guilt."  The defendant also asserts these errors regard "a matter of law and should be reviewed de novo."  Finally, he contends that the errors were "reversible."

We are aware of no authority for de novo review of trial errors in the context of plain error analysis.  The only case cited by the defendant for this proposition, People v. Robinson, 172 Ill. 2d 452, 457, 667 N.E.2d 1305 (1996), concerns "the construction of a statute" and is thus inapposite.  We reject the defendant's assertion of de novo review of the issue before us. Regarding the claimed errors being reversible, "all plain errors are reversible ones, [however,] not all reversible errors are also 'plain' ***."  People v. Keene, 169 Ill. 2d 1, 17, 660 N.E.2d 901 (1995).  Thus, the defendant's claim that the alleged "error in this case is reversible," adds little to the plain error analysis.

Finally, we have reviewed the alleged errors in the context of the record, and find none rises to the level of plain error so as to have deprived the defendant of a fair trial.  In other words, we cannot say that any of the claimed errors were so fundamental to the integrity of the judicial process and so prejudicial to the defendant as to warrant relief under this

34

second prong of the plain error rule.  See <u>People v. Carlson</u>, 79 Ill. 2d 564, 577, 404 N.E.2d 233 (1980) (whether or not the erroneous evidence or remarks were objected to at the trial, a court of review will grant relief if the trial error is so prejudicial that real justice has been denied).  Accordingly, there is no basis to excuse the procedural default with respect to the disputed testimony and remarks; the procedural bar must be honored.  <u>Keene</u>, 169 Ill. 2d at 27-28.

## CONCLUSION

For the foregoing reasons, we affirm the defendant's conviction but remand for resentencing.

Affirmed; sentence vacated and cause remanded.

BURKE, and HALL, JJ., concur.